*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2002 FED App. 0205P (6th Cir.)
File Name: 02a0205p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

MX GROUP, INC.,
        *Plaintiff-Appellee,*

    *v.*

CITY OF COVINGTON, *et al.*,
        *Defendants-Appellants.*

No. 00-6305

Appeal from the United States District Court
for the Eastern District of Kentucky at Covington.
No. 98-00007—William O. Bertelsman, District Judge.

Argued: March 19, 2002

Decided and Filed: June 12, 2002

Before: BATCHELDER and CLAY, Circuit Judges;
CARR, District Judge.[*]

———————————

## COUNSEL

**ARGUED:** Stephen T. McMurtry, OTTO DANIEL WOLFF & ASSOCIATES, Covington, Kentucky, for Appellants. David E. Davidson, COBB & OLDFIELD, Covington,

---

[*] The Honorable James G. Carr, United States District Judge for the Northern District of Ohio, sitting by designation.

1

Kentucky, for Appellee. **ON BRIEF:** Stephen T. McMurtry, OTTO DANIEL WOLFF & ASSOCIATES, Covington, Kentucky, for Appellants.  David E. Davidson, William C. Oldfield, COBB & OLDFIELD, Covington, Kentucky, for Appellee.

————————————

## OPINION

————————————

   CLAY, Circuit Judge.  Defendants, the City of Covington, Kentucky, the Covington Board of Adjustment, Marc Tischbein, and the Covington Station Council of Co-Owners, Inc., appeal the judgment of the district court, after a bench trial, in favor of Plaintiff pursuant to claims brought under Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12131, *et seq*., and the Rehabilitation Act of 1973 ("Rehabilitation Act"), 29 U.S.C. § 701 *et seq*.  Plaintiff, MX Group, Inc., alleged that Defendants discriminated against it because of Plaintiff's association with its potential clients, who are drug addicted persons, by refusing to issue a zoning permit to Plaintiff so that it could open a methadone clinic in the City of Covington.  Plaintiff claims that Defendants further discriminated against it by amending the city's zoning ordinance to completely prohibit the clinic from opening anywhere in the city.  The district court found that Plaintiff's clients or potential clients were persons with a disability and that Defendants discriminated against Plaintiff because of Plaintiff's association with its clients/potential clients.  For the reasons that follow, we **AFFIRM**.

## BACKGROUND

### Procedural History

   On January 16, 1998, Plaintiff filed a two-count complaint in the district court, alleging violations of the ADA and the Rehabilitation Act.  On July 21, 1998, Plaintiff amended its complaint, adding as a third cause of action denial of

substantive due process. According to the district court's opinion, Plaintiff also asserted a constitutional equal protection claim. Defendants filed an answer on August 20, 1998. Defendants moved for summary judgment on August 2, 1999. The district court held a hearing on the motion and denied it on December 17, 1999. The district court also set a date of January 8, 2000 for a bench trial. At the close of all the evidence, the district court asked the parties to file memoranda in support of their positions. Plaintiff filed its memorandum on March 6, 2000, and Defendants filed their memorandum/brief on April 5, 2000. On August 8, 2000, the district court entered an opinion and order in favor of Plaintiff's ADA and Rehabilitation Act claims. *See MX Group, Inc. v. City of Covington*, 106 F. Supp. 2d 914 (E.D. Ky. 2000). The district court also entered an order and injunction, which provided that Defendants' ordinance, essentially banning Plaintiff's proposed methadone clinic from operating anywhere in the City of Covington, violated the ADA. The order also enjoined Defendants from withholding the necessary permits and permission from Plaintiff for a methadone clinic. Defendants moved to alter and amend the order; after oral arguments were heard on that motion, the district court denied Defendants' motion on September 8, 2000. Defendants thereafter filed this timely notice of appeal.

**Facts**

The parties agree that the facts are essentially undisputed. Plaintiff, MX Group, is in the business of providing drug treatment through the use of methadone.[1] In 1997, Plaintiff began the process of locating a site to open a methadone clinic in Covington, Kentucky. The proposed purpose of the clinic was to provide methadone treatment, counseling,

---

[1] Methadone is a "synthetic narcotic drug . . . that blocks the effects of heroin and may be used as a heroin substitute in the treatment of heroin addiction and as a painkiller." *The Random House College Dictionary*, 841 (rev. ed. 1982).

medical examinations, and other services for recovering opium addicts.

Melissa Fabian and Edith McNeill, both of whom were then affiliated with Plaintiff, contacted Chuck Eilerman, a realtor, who provided them with a list of properties in Covington that met the needs of the facility. Fabian testified that in searching for a location, affordability was important as was location. She testified that she was not looking in residential areas, but only business or commercial areas. Further, it was important that the location be accessible to clients. After looking at several potential sites, Plaintiff found a suitable location at 200 West Pike Street. The building was divided into office condominiums and used to serve as a train station. Plaintiff entered into a lease agreement with one of the owners of office space in the building, and contacted Covington's Zoning Administrator Ralph Hopper to apply for a zoning permit for that location.

After he was first contacted by Plaintiff regarding the permit but before Plaintiff actually sought a zoning permit for the clinic, Hopper contacted his superiors about the methadone clinic. Although this was not normal procedure, Hopper thought the clinic would be "potentially controversial." Hopper completed the application for the zoning permit and issued the permit on the day Plaintiff applied for it, August 19, 1997.

After the zoning permit was issued, town residents expressed their displeasure regarding the proposed clinic at a City Commission meeting. As a result, on September 8, 1997, the city held a hearing chaired by Assistant City Manager Tom Steidel regarding Plaintiff's application for a zoning permit. Steidel testified at trial that the hearing was informational in nature, and was intended to provide information for and against the establishment of the clinic. Steidel testified that the meeting was intended to provide Plaintiff and concerned Covington citizens an opportunity to air their concerns regarding the clinic. The meeting lasted

we also agree with the Ninth Circuit that it would make little sense under these circumstances to require Plaintiff to seek an accommodation, when the only accommodation, a fundamental change to the ordinance, could not be considered reasonable. 28 C.F.R. § 35.130(b)(7). Thus, whether couched in terms of a failure to exhaust administrative remedies or a failure to request a reasonable accommodation, Defendants' arguments that we should not entertain this appeal because of Plaintiff's failure to take futile actions are rejected.

### CONCLUSION

For the foregoing reasons, we **AFFIRM** the judgment of the district court.

Cir.1984); *Assoc. of Westinghouse Salaried Emp. v. Westinghouse Elec. Corp.*, 283 F.2d 93, 96 (3rd Cir.1960); *Mutual Assurance, Inc. v. Wilson*, 716 So.2d 1160, 1165 (Ala.1998); Bank of *Papillion v. Nguyen*, 252 Neb. 926, 567 N.W.2d 166, 171 (1997)).

We also reject Defendants' reasonable accommodation argument because it is inapplicable inasmuch as the ordinance at issue is facially discriminatory. When faced with an analogous situation, the Ninth Circuit in *Bay Area* rejected reasoning similar to the reasoning advanced by Defendants here. In that case, the district court denied Bay Area's motion for preliminary injunction on several grounds, including that it had failed to the show that the city did not provide a reasonable accommodation. *Bay Area*, 179 F.3d at 733. Reversing, the Ninth Circuit held that when a neutral ordinance is administered in a way that discriminates against the disabled, then it is appropriate to inquire whether the public entity can make a reasonable accommodation for the disabled. *Id*. at 734. However, where the "statute discriminates against qualified individuals on its face rather than in its application," then the applicable regulation interpreting Title II, which only requires "reasonable" accommodation, makes little sense. The regulation requires reasonable modifications where necessary to avoid discrimination unless the modification would fundamentally alter the program, activity, or in this case, the ordinance. 28 C.F.R. § 35.130(b)(7); *see also Bay Area*, 179 F.3d at 734. The only way to alter a facially discriminatory ordinance is to remove the discriminating feature; but to do so, would "fundamentally alter the ordinance." *Id*. As amending the facially discriminatory ordinance would make the statute a "nullity," or otherwise fundamentally change its meaning, the Ninth Circuit held that it would not apply the reasonable modification requirement in such situations. *Id*.

In the instant case, the district court found that the blanket prohibition of all methadone clinics from the entire city is discriminatory on its face. We agree with that finding, and

two to three hours, and was not transcribed or recorded. Steidel also testified that there was a wide range of reaction and emotion at the meeting, ranging from "proper decorum" to anger regarding the proposed clinic.

Another owner of an office in the building where the clinic was to be located appealed Hopper's decision to issue the permit. On December 17, 1997, the Covington Board of Adjustment held a hearing on the matter. Numerous persons testified at the hearing for and against Hopper's decision. Covington Assistant Police Chief William Dorsey testified that from a police officer's perspective, he saw no need for a methadone clinic in Covington. Dorsey testified that based on his research, he found that for-profit methadone clinics spawn criminal activity. He contacted other clinics in other towns and was told about trouble outside of clinics, such as drug use and/or trafficking and drug trade, violence, shootings and death. He testified that there is a large number of burglaries at methadone clinics as a result of people breaking in to steal drugs. He also testified that the town should be concerned about the safety of the neighborhood children inasmuch as there is a school near the proposed site. Further, he added that "addicts" generally find a way to wean themselves from the drugs and then sell the take-home dosages they are provided. Dorsey did not provide any statistics or other specifics regarding these alleged ill effects. Apparently under the impression that Plaintiff operated a clinic in Greentree, Pennsylvania, as part of Dorsey's research, he contacted the Greentree police department, which told him there had been increased police runs to the clinic. However, the security officer in the building where Plaintiff is located in Greentree told him that he had experienced no problems. (J.A. at 234.) Dorsey admitted that he told the Board of Adjustment about the police statements but not about the statements of the security officer. Other residents also testified for, but mostly against, allowing the facility to open.

Sergeant John Burke, commander of the Pharmaceutical Diversion Squad of the Cincinnati Police Division testified that he had experienced problems regarding criminal activity, such as drug dealers preying on those using drugs outside of methadone clinics in his town. He testified that he had no direct experience with for-profit clinics, but he had received reports from a nearby clinic in Indiana with which he was familiar. He testified that that clinic also had experienced problems relating to drug activity.

One person who spoke in support of the facility had herself been a heroin addict for ten years, and testified that she would travel to Covington to pick up her drugs. She testified that in April 1996, she entered a clinic located in Indiana, and was stabilized and able to obtain a job in a school. She testified that she was able to resume her life after a 60-day "detox," and was able to completely "detox"after a year and a half. As a result of her methadone treatment, she testified that she was drug free. Plaintiff also put on videotape evidence of Wayne Crabtree, a program director of a methadone clinic in Louisville. Crabtree testified that his clinic had experienced no acts of violence committed against anyone in the community, although he stated that there once had been a problem between two clients. Essentially, he stated that his clinic operated without incident.

The Board of Adjustment voted to overrule Hopper's decision and revoked the zoning permit. Plaintiff appealed the Board of Adjustment's decision to the state circuit court. However, the appeal was dismissed for failure to name a necessary party.

During the spring of 1998, Plaintiff contacted Hopper again about obtaining another location in the city, at 1 West 43rd Street. The site had been a doctor's office, and it was located in a shopping center zone. The site was in front of the City's trash compacting station, bordering an industrial zone, and separated from housing by a four-lane highway. The building was in a location with good public transportation, was

activity." 28 C.F.R. § 35.130(b)(7). Therefore any accommodation on the part of the entity only needs to be "reasonable." *Johnson v. City of Saline*, 151 F.3d 564 (6th Cir. 1998).

Defendants argue that the ADA only imposes a responsibility on an entity such as the city to make a reasonable accommodation when it is asked to do so. It contends that the qualified individual with a disability must first request a modification before asserting judicial relief. *See Oconomowoc Residential Programs, Inc. v. City of Greenfield*, 23 F. Supp. 2d 941, 955 (E.D. Wis. 1998) (citing *Oxford House-A v. City of Univ. City*, 87 F.3d 1022, 1024-25 (8th Cir. 1996)). We reject Defendants' arguments for two reasons.

First, Plaintiff did request a reasonable accommodation when it sought approval for an alternative site for its clinic, albeit after it filed suit. In any event, although Defendants now complain that Plaintiff could have sought a text amendment or requested a conditional use permit, Hopper testified at trial that he did not remember explaining to McNeil that she could have sought a text amendment or "any other procedure that could be followed." (J.A. at 213-14.) Hopper also testified that he did not recall even showing McNeil the city attorney's letter. McNeil testified that Hopper did not inform her that she could have applied for a text amendment. (J.A. at 263.) Further, as explained earlier, a few months after Plaintiff found another site and was informed by Hopper that it could use that site, the city council changed the city ordinance, barring Plaintiff from opening in any zone in the city. It would make little sense to require Plaintiff to seek from city officials a change in the ordinance to allow a methadone clinic to operate when city officials had been meeting for months to promulgate a rule stating that no more such clinics could open in the city. We agree with the district court, that "[t]he law requires no one to perform a useless act." *MX Group*, 106 F. Supp. 2d at 920 (citing *Jaffe-Spindler Co. v. Genesco*, 747 F.2d 253, 258 (4th

In the instant case, Plaintiff filed this suit without first seeking a text amendment to the ordinance or requesting a permitted or conditional use permit. However, based on the record as a whole, it is obvious that such a request would have been futile, especially in light of the fact that the June 1998 amendment to the ordinance effectively prohibited clinics such as Plaintiff's clinic from opening anywhere in the city. As Plaintiff had already faced substantial opposition from city administrators, including the Board of Adjustment, before Plaintiff filed this suit, and ultimately any remedy Plaintiff sought likely would have been futile, we hold that Plaintiff sufficiently exhausted its administrative remedies before filing this suit. *Bannum*, 958 F.2d at 1362-63 (explaining that although further administrative actions could have been pursued, the requirements of the finality doctrine were met as seeking further administrative redress would have been futile); *cf. Bigelow v. Michigan Dep't of Natural Res.*, 970 F.2d 154, 158-59 (6th Cir. 1992) (holding in case involving federal takings and equal protection claims that unlike plaintiffs in *Bannum*, plaintiffs in this case had not shown that pursuit of further administrative remedies would have been futile).

## C.    PLAINTIFF FAILED TO SEEK A REASONABLE MODIFICATION

Title II proscribes discrimination against qualified individuals with a disability. *See* 42 U.S.C. § 12131(2). This means "an individual with a disability who, with or without reasonable modifications to rules, policies, or practices meet the essential eligibility requirements for receipt of services or the participation in programs or activities provided by a public entity." *Id*.; 42 U.S.C. § 12132. The regulations interpreting Title II state, "[a] public entity shall make reasonable modifications in policies, practices, or procedures when the modification is necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program or

affordable and was available. Hopper again thought this use would be a permitted use under the zoning code, and told McNeil so. However, recognizing the controversy concerning the clinic, Hopper also informed the city manager, Greg Jarvis, of Plaintiff's latest request. In response, on March 17, 1998, the city solicitor sent a letter to Hopper, which according to Hopper, basically stated that as the zoning ordinances then stood, a methadone clinic, such as Plaintiff's, was not a permitted use in any zone in the city.

After the Board of Adjustment hearing, the Covington General Affairs Committee and Hopper met, and issued a report entitled "Preventing the Proliferation of Addiction Treatment Facilities in Covington." The report included a proposed amendment to the zoning code, which was adopted by Covington in June 1998. The amendment expanded the definition of "addiction treatment facility" in the zoning code to include any place whose primary function is to care for the chemically dependent. The zoning code previously only used the term to apply to programs that provided overnight or housing accommodations. The ordinance limited the number of all such facilities to one facility for every 20,000 persons in the city. The amendment completely foreclosed Plaintiff's opportunity to locate in the city.

Hopper testified that one residential treatment facility had previously wanted to locate in the city, but at that time the business did not fit into a category as listed in the zoning code. The facility, the Women's Residential Assistance Treatment Program ("WRATP"), requested an amendment and both it and another facility, operated by the same group that operates the WRATP, were allowed to locate in the city as a result of the ordinance amendments. In the March 17, 1998 letter that the city solicitor sent to Hopper, the city solicitor indicated that in the future if Hopper received an application for a narcotics treatment program, he may want to conduct a study to determine the best zone for the location of an out-patient treatment program. Hopper explained at trial that he interpreted this to mean that a text amendment to the

ordinance may be sought, much like that which occurred with the WRATP.

Fabian testified at trial that the program MX intended to establish would not only provide methadone treatment, but also offer other services, such as counseling. She testified that often a drug addiction affects a person's life in numerous ways, including loss of employment, spouses and children. She testified that the addiction affects a person's ability to hold a job, to engage in parenting, or to function socially. To enter the program and qualify as a client, an individual had to show that he or she had been an addict for at least one year. Such a showing could be made by way of letters from an employer, parent, parole or probation officer, or another provider.

McNeil testified at trial that the clinic in Erie, Pennsylvania had experienced none of the problems Dorsey raised at the Board of Adjustment hearing. She testified that she had experienced no trouble with robberies, murders, arrests or diversion at the Erie facility.

At trial, Mark Caverly of the Drug Enforcement Agency also testified. He testified about concern regarding drug diversion at methadone programs, but stated that such concern arises anywhere that drugs are present, such as pharmacies or doctors' offices.

## DISCUSSION

## I.

The district court's findings of fact will be set aside only for clear error. *See Burzynski v. Cohen*, 264 F.3d 611, 616 (6th Cir. 2001); *AM Intern., Inc. v. Int'l Forging Equip. Corp.*, 982 F.2d 989, 998 (6th Cir. 1993); Fed. R. Civ. P. 52(a). "This standard does not entitle a reviewing court to reverse a district court's findings of fact because the reviewing court is convinced it would have decided the case differently." *Equal Employment Opportunity Commission v. Yenkin-Majestic*

Defendants argue that before the city changed its ordinance to ban Plaintiff from opening its clinic in the city, Plaintiff could have applied for a "permitted" or a "conditional" use permit in a proper zone. They further argue that Plaintiff could have sought a text amendment to the ordinance, so as to allow the clinic to open.

Other than citing authority for the broad proposition that parties should exhaust administrative remedies in general, Defendants cite no authority to support their position that Plaintiff was required to do any more than it did before it instituted this action. Indeed, in *Bannum, Inc. v. City of Louisville*, 958 F.2d 1354, 1361-64 (6th Cir. 1992), this Court rejected a somewhat similar argument, albeit in terms of a constitutional equal protection claim. In that case, Bannum brought an action against Louisville after the city passed an ordinance that required rehabilitation facilities such as Bannum, and only such facilities, to seek a special use permit in order to open in any zone in the city. *Id*. Louisville argued that because Bannum did not apply for a conditional use permit it had not satisfied the doctrine of finality. *Id*. at 1361-62. The Court noted that the doctrines of finality and exhaustion of remedies are similar, and further stated,

> What is needed before litigation can proceed in a case such as this is that proceedings have reached some sort of an impasse and the position of the parties has been defined. We do not want to encourage litigation that is likely to be solved by further administrative action and we do not want to put barriers to litigation in front of litigants when it is obvious that the process down the administrative road would be a waste of time and money. We believe that finality, and not the requirement of exhaustion of remedies, is the appropriate determinant of when litigation may begin. By finality we mean that the actions of the city were such that further administrative action by Bannum would not be productive.

*Id*. at 1362-63.

no acts of violence committed against anyone in the community, and essentially had operated without incident. Defendants point to no other evidence from any other methadone clinic representatives indicating that such clinics attract increased drug activity or crime. Therefore, we believe that the district court correctly found that the board's decision to deny Plaintiff a zoning permit, and the city's subsequent decision to change the zoning ordinance to ban Plaintiff from operating anywhere in the city, were based on stereotypes and fear and violated the ADA and Rehabilitation Act. *Bay Area*, 179 F.3d at 729 n.5; 28 C.F.R., pt. 35, App. A to 28, § 35130(g).

## B.  EXHAUSTION   OF   ADMINISTRATIVE REMEDIES

Defendants contend that this Court should not entertain this appeal because Plaintiff failed to exhaust its administrative remedies. The Board of Adjustment overturned Hopper's decision to grant a zoning permit at the 200 West Pike Street location in December 1997. Plaintiff filed suit on January 16, 1998. Plaintiff also later sought an alternative site at 1 West 43rd Street for its methadone clinic, and contacted Hopper in March 1998 to inquire whether the site would be a permitted use. Hopper stated that it would be. However, the city attorney wrote Hopper a letter on March 17, 1998, informing him that a narcotics treatment program was not defined in the city zoning code. The letter further stated that because it was not defined in the code, the city attorney did not believe it would be a permitted or conditional use in any zone in the city. He did tell Hopper that if Hopper received an application for a narcotics treatment program, such as a methadone clinic, he may want to initiate a study to determine the best zone for the location as a permitted or conditional use. However, in June 1998, the city ordinance was amended essentially prohibiting Plaintiff from opening its clinic any where in the city.

*Paint Corp.*, 112 F.3d 831, 833 (6th Cir. 1996). Further, where there are two permissible ways to view the evidence, the district court's decision to view the evidence in one of those ways as opposed to the other cannot be clear error. *Id.* (citing *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 573-74 (1985)). The district court's conclusions of law, however, are reviewed *de novo*. *Burzynski,* 264 F.3d at 616.

## II.

Defendants argue that Plaintiff lacks "prudential" standing to bring this suit under either Title II of the ADA or the Rehabilitation Act. Defendants argue that Plaintiff may not seek redress under the ADA or the Rehabilitation Act without an individualized inquiry into whether at least one of its clients or potential clients is disabled. Defendants contend that Plaintiff was required to join as a plaintiff, a client, or potential client so that an individualized inquiry could be made to determine whether the client or potential client is disabled. We will address each of these contentions below.

As a preliminary matter, we note that Plaintiff asserts claims under both the ADA and the Rehabilitation Act. The district court analyzed Plaintiff's claims under both acts together, and referred only to the ADA in its analysis, "since the results are the same under both Acts." *MX Group, Inc.*, 106 F. Supp. 2d at 915. We will do the same inasmuch as both acts are interpreted consistently with one another. *See e.g.,* 42 U.S.C. § 12201(a) (ADA is not to "be construed to apply a lesser standard than the standards applied under . . . Rehabilitation Act of 1973 . . . ."); *Andrews v. State of Ohio*, 104 F.3d 803, 807 (6th Cir. 1997) (explaining that because "standards under both of the acts are largely the same, cases construing one statute are instructive in construing the other"); *see also Bay Area Addiction Research and Treatment, Inc. v. City of Antioch*, 179 F.3d 725, 731 (9th Cir. 1999) (noting that Congress has instructed that both ADA and Rehabilitation Act are to be interpreted consistently); *Innovative Health Sys., Inc. v. City of White Plains*, 117 F.3d

37, 44-46 (2d Cir. 1997) (holding that language under ADA and Rehabilitation Act similarly ban discrimination by a public entity and such discrimination includes a public entity's zoning decisions).

Plaintiff also asserted claims pursuant to 42 U.S.C. § 1983, alleging that the denial of a permit to operate the methadone clinic violated its rights to substantive due process and equal protection. The district court did not reach those claims inasmuch as it found Plaintiff prevailed on its ADA and Rehabilitation Act claims. *MX Group, Inc.*, 106 F. Supp. 2d at 915. Plaintiff does not raise its constitutional claims on appeal or otherwise challenge the district court's disposition of those claims.

## A. STANDING UNDER THE ADA AND REHABILITATION ACT

Whether a party has standing under Article III of the Constitution to bring a claim "involves both constitutional limitations on federal-court jurisdiction and prudential limitations on its exercise." *Warth v. Seldin*, 422 U.S. 490, 498 (1975). Standing is a threshold inquiry in every federal case and it involves an inquiry into whether "a plaintiff has alleged such a personal stake in the outcome of the controversy as to warrant his invocation of federal-court jurisdiction to justify exercise of the court's remedial powers on his behalf." *Id*. (citation and internal quotation marks omitted). Aside from the minimal standing requirements under Article III, however, prudential considerations may bar a person or entity from asserting standing on behalf of the rights of others. *Id*. at 500-501. Prudential barriers do not apply in all cases. "Congress may grant an express right of action to persons who otherwise would be barred by prudential standing rules," although Article III's requirements remain. *Id*. at 501.

[S]o long as this requirement [Article III] is satisfied, persons to whom Congress has granted a right of action,

the actual impairment of drug addiction, the ADA was not violated. However, "[i]t is clear that insofar as the Rehabilitation Act [or the ADA] evinces a general recognition of substance abuse as a disease, discrimination on the basis of such a handicap is antithetical to one of the goals of the Act—to ensure that persons . . . are not victimized . . . by . . . *stereotypical assumptions concerning their handicap*." *Teahan v. Metro-North Commuter R. Co.*, 951 F.2d 511, 518 (2d Cir. 1991) (emphasis added). Therefore, where the discrimination results from unfounded fears and stereotypes that merely because Plaintiff's potential clients are recovering drug addicts, they would necessarily attract increased drug activity and violent crime to the city, such discrimination violates the ADA and Rehabilitation Act. *Id*.

Based on witness testimony at the Board of Adjustment hearing, we believe that Plaintiff adduced sufficient evidence to show that the reason the city denied Plaintiff the zoning permit was because the city feared that Plaintiff's clients would continue to abuse drugs, continue in their drug activity, and attract more drug activity to the city. In other words, based on fear and stereotypes, residents believed that the drug addiction impairment of Plaintiff's potential clients, at the very least, limited the major life activity of productive social functioning, as their status as recovering drug addicts was consistently equated with criminality. *Ross*, 237 F.3d at 706. The record also supports the district court's finding that the Board of Adjustment denied Plaintiff's permit primarily for these reasons.

There was ample evidence before the district court, however, that Plaintiff's other clinic in Pennsylvania had operated without incident of criminal activity, and that methadone clinics present no more problems in the way of drug trafficking and diversion than other facilities that deal with lawfully administered drugs, such as hospitals and pharmacies. By way of video, Wayne Crabtree, program director of a methadone clinic in Louisville, explained at the Board of Adjustment hearing that his clinic had experienced

violence, guns and drugs." As the district court found, he provided no statistics and gave no specifics.

There was also testimony at the hearing from Sergeant John Burke, commander of the Pharmaceutical Diversion Squad of the Cincinnati Police Division. Burke testified that he had experienced problems regarding criminal activity, such as drug dealers preying on those using drugs outside of clinics. He testified that he had no direct experience with for-profit clinics, except reports from a nearby clinic in Indiana, of which he was familiar.

In *Bay Area*, 179 F.3d 725, the Ninth Circuit faced a somewhat similar issue. There, a methadone clinic was seeking to relocate to Antioch, California, but was stopped when the Antioch City Counsel enacted an ordinance that essentially prevented the facility from opening. *Id*. at 727-28. Before enacting the zoning ordinance, the city council held a meeting, where residents voiced concerns about safety in the neighborhoods, their fear of the influx of felons coming into the neighborhood, and the violence and damage the clinic would bring. *Id.* at 729 n.5. The testimony in the instant case was similar. Residents in the instant case spoke of the safety of neighborhood children and the image the city was trying to maintain. Residents complained that a methadone clinic would attract violence and drug activity to the community.

One of the purposes of the ADA is to prevent discrimination against those regarded as being disabled. *Ross*, 237 F.3d at 706. According to the regulations, "a person who is denied services or benefits by a public entity because of myths, fears, or stereotypes associated with disabilities would be covered under" the regarded as prong, "whether or not the persons' physical or mental condition would be considered a disability under the first or second test in the definition." 28 C.F.R., pt. 35, App. A to 28, § 35.104 at 518-19. Defendants apparently contend that because the discrimination Plaintiff encountered was based on the alleged increased crime that drug addicts bring to an area instead of

either expressly or by clear implication, may have standing to seek relief on the basis of the legal rights and interests of others, and indeed, may invoke the general public interest in support of their claim.

*Id*.

An association or organization may assert standing in one of two ways: (1) on its own behalf because it has suffered a palpable injury as a result of the defendants' actions; or (2) as the representative of its members. *Id*. at 511; *Hunt v. Washington State Apple Advertising Comm*., 432 U.S. 333, 341-42 (1977). Of course, as stated, an entity may sue in its own right for injuries sustained as a result of a defendant's actions, without prudential standing concerns, where Congress has provided the entity such a right. *See Havens Realty Corp. v. Coleman*, 455 U.S. 363, 372,378-79 (1982) (holding that non-profit organization had standing to bring suit on its own behalf under Fair Housing Act, where organization alleged that defendant's steering practices impaired its ability to perform its goal of providing "counseling and referral services to low and moderate income homeseekers").

Title II of the ADA states that "no qualified individual with a disability shall, by reasons of such disability, be excluded from participation in or be denied the benefits of the services, programs or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. The federal courts have addressed the issue of whether an entity such as MX Group has standing to sue under the ADA or the Rehabilitation Act when it has suffered an injury as a result of discrimination against its clients. *See e.g., Innovative Health Sys.*, 117 F.3d at 46-48; *Oak Ridge Care Ctr., Inc. v. Racine County*, 896 F.Supp. 867, (E.D. Wisc. 1995). The Second Circuit has engaged in an extensive analysis on this issue in *Innovative*. A brief factual background of that case before discussing the standing analysis would be helpful.

In *Innovative*, Innovative or "IHS," an outpatient drug and alcohol treatment center, began efforts to relocate to downtown White Plains, New York. *Innovative*, 117 F.3d at 40. More than a year after seeking a permit to relocate into that area, IHS was denied the necessary building permit by the city's zoning board of appeals. *Id*. IHS and five individuals brought suit against several defendants, including the City of White Plains, the mayor and the zoning board of appeals. *Id*.

IHS had originally sought a building permit for the downtown site which had previously been a retail space. *Id*. at 41. The deputy commissioner of buildings determined that the IHS's proposed use for the facility constituted a business or professional office under the applicable zoning ordinance. *Id*. However, because the IHS application for the permit requested a change of use from "retail" to "office," the application was referred to a planning board. *Id*. The application created controversy. At public meetings held by the planning board, members of the community expressed concerns about the appearance of the people who attend alcohol and drug-dependence programs and the effect such a program would have on property values. *Id*. After the meetings, because of continued opposition, IHS withdrew its application and reapplied for a permit to renovate the site, which would not have required the planning board's approval. However, the community still opposed IHS's proposed use. *Id*. The commissioner reaffirmed his position that the use was allowed and that decision was affirmed by White Plains' corporate counsel. *Id*. However, on appeal, the zoning board of appeals voted to reverse the commissioner's decision, and IHS and several of its clients instituted suit. *Id*. at 42.

The defendants moved for dismissal on several grounds, including that the plaintiffs lacked standing. Specifically, the defendants argued that IHS lacked prudential standing to assert a claim under either the ADA or the Rehabilitation Act. *Id*. at 46. The defendants argued that Title II and the Rehabilitation Act both only conferred rights on a narrow class of people, i.e., "qualified individual[s] with a disability."

Defendants further argue, however, that to the extent they discriminated against Plaintiff's potential clients or Plaintiff (because of its association with its potential clients), such discrimination was based on fear of criminal activity. The discrimination, Defendants contend, was not based on a mental or physiological impairment. Defendants essentially contend that a drug addict's "propensity . . . to commit a crime or to attract criminal activity is not a mental or physiological impairment recognized under the ADA."

For support, Defendants rely on *Andrews*, 104 F.3d 803. In that case, this Court rejected a claim by police officers who argued that they were discriminated against when their employer perceived them as being disabled due to their weight problems. *Id*. at 805. In rejecting the claim, the Court reasoned that the mere physical characteristic of being overweight without more (for instance, a glandular problem) was not enough to equal a physiological disorder. *Id*. at 809-10. Defendants here contend that it was the secondary effects of criminality and not a physiological impairment that resulted in the discrimination. *Andrews*, however, is inapposite as the plaintiffs' claims in that case failed on their face because the plaintiffs could not show that the basis of their discrimination was anything other than a slight weight problem, which under the regulations did not constitute an impairment. *Id*. However, as already established, drug addiction is considered an impairment under the ADA. *See* 28 C.F.R., pt. 35, App. A to 28, § 35.104 at 516 (listing drug addiction as a physiological condition/impairment).

Below, the district court relied on the Board of Adjustment hearing transcript to support its finding that Defendants regarded Plaintiff's clients or potential clients as disabled. At the hearing, Dorsey testified that in the cases in which he had contacted clinics, he was told the same story. He was informed of altercations outside the clinics, open-air drug markets, and violence and drug thefts. "In near and around, wherever the for-profit clinics are located, there appears to be an increased level of criminal activity which involves

"There are two apparent ways in which individuals may fall within the definition of disability under the 'regarded as' prong: (1) a covered entity mistakenly believes that a person has a physical impairment that substantially limits one or more major life activities, or (2) a covered entity mistakenly believes that an actual but non-limiting impairment substantially limits a major life activity." *Ross v. Campbell Soup Co.*, 237 F.3d 701, 706 (6th Cir. 2001) (citing *Sutton*, 527 U.S. at 429). It is necessary that the entity entertain misperceptions about the individual, believing that one has a substantially limiting impairment that one does not have, or that one has a substantially limiting impairment when, in fact, the impairment is not so limiting. *Id.*

Defendants contend that in order to examine Plaintiff's clients under the "regarded as" prong, the Court still must consider the mitigating effects of the methadone. We disagree. Under the regarded as prong, this Court does not even focus on the disability, but on the perception of the employer regarding the perceived disability. As the Court stated in *Ross*, in determining who may invoke the protection of the ADA, we do not always look to the individual claiming discrimination; when that individual seeks to proceed under a "regarded as" theory, we must look to the state of mind of the entity against whom he makes a claim. *Ross*, 237 F.3d at 706 (explaining that under the regarded as prong, an individual can invoke the ADA's protections "even if he is not, in fact, disabled"). Therefore, unlike in a scenario in which the Court is trying to determine whether an individual presently suffers from a substantially limiting impairment under the first prong of the definition of disability, under the "regarded as" prong, the Court must determine whether Defendants' perceived Plaintiff's clients as being disabled and discriminated against them on that basis. *See e.g., Parry v. Mohawk Motors of Michigan, Inc*., 236 F.3d 299, 310 (6th Cir. 2001) ("The ADA provides protection for employees who are *erroneously regarded as* current illegal drug users.").

*Id*. at 46. The Second Circuit, however, noted that it had to determine "whether the statutes 'grant[] persons in [IHS's] position a right to judicial relief,'" *Id*. at 47 (citing *Warth*, 422 U.S. at 500), in order to determine whether IHS had standing. Although 42 U.S.C. § 12132 of the ADA states that no qualified individual with a disability shall be denied benefits by a public entity, § 12133, ADA's public entity enforcement provision, states that the statute extends its remedies to "any person alleging discrimination on the basis of disability." *Id*. Similarly, the Rehabilitation Act protects "any person aggrieved" by the discrimination of a person on the basis of his or her disability. *Id*. (citing 29 U.S.C. § 794a(a)(2)). According to the court, "such broad language in the enforcement provisions of the statutes evinces a congressional intention to define standing to bring a private action . . . as broadly as is permitted by Article III of the Constitution." *Id*. (citation and internal quotation marks omitted). Thus, the Second Circuit held that as Title II of the ADA and the Rehabilitation Act, respectively, provide relief to any person alleging discrimination on the basis of a disability (ADA), or any person aggrieved by the discrimination of a person on the basis of his or her disability (Rehabilitation Act), IHS could institute an action because it had a right to judicial relief. *Id*.; *see also Liberty Resources, Inc. v. Southeastern Pennsylvania Transportation Auth*., 155 F. Supp. 2d 242, 249 (E.D. Pa. 2001) ("[T]he enforcement provision of the ADA . . . broadly refers to any person, not solely disabled individuals.").

In addition, the Second Circuit reasoned that as to Title II of the ADA, specifically, the regulations implementing the ADA allow entities such as IHS to bring a right of action because of their association or dealings with disabled persons. The ADA is divided into several sections--proscribing discrimination in employment (Title I); discrimination by public entities (Title II) and discrimination in public transportation (Title III)--and Congress granted authority to the Department of Justice to implement regulations pertaining

to Title II.  *See United States v. Sutton*, 527 U.S. 471, 478-79 (1999).   According to the regulations implementing Title II,

> A public entity shall not exclude or otherwise deny equal services, programs, or activities to an individual or entity because of the known disability of an individual with whom the individual or entity is known to have a relationship or association.

28 C.F.R. § 35.130(g).

In adopting these regulations, the Department of Justice was following congressional intent, in that Congress directed that Title II should be read to incorporate the provisions of Titles I and III, which expressly "define discrimination to include conduct directed at an entity based on its relationship or association with disabled persons." *Innovative*, 117 F.3d at 47 (citing 42 U.S.C. §§ 12112(b)(4), 12182(b)(1)(E)).  In addition, the appendix to the regulations explain that "the individuals covered under this paragraph are any individuals who are discriminated against because of their known association with an individual with a disability." *Id*.  It states, "[f]or example, it would be violative of this paragraph for a local government to refuse to allow a theater company to use a school auditorium on the grounds that the company had recently performed for an audience of individuals with HIV disease."  28 C.F.R., pt. 35, App. A to 28, § 35130(g).  In such circumstances, the theater company would have a right of action because of the wrong done to it.  The rule is therefore intended to encompass "entities that provide services to or are otherwise associated with" individuals with disabilities. *Id*.  "The provision was intended to ensure that entities such as health care providers, employees of social service agencies, and others who provide professional services to persons with disabilities are not subjected to discrimination because of their professional association" with them.  *Id*.  Thus, under the statute and by virtue of the regulations, IHS had standing.

under this prong, Plaintiff must show that its potential clients have a record of "an impairment that would substantially limit one or more of the individual's major life activities." *Hilburn v. Murata Electronics North America, Inc.*,  181 F.3d 1220, 1229 (11th Cir. 1999).  Plaintiff has made such a showing.  In order to be admitted into Plaintiff's program, a person must have a history of one year of opiate or narcotic addiction, including physical dependence.  Proof of an addiction that has lasted for at least one year is required.  (J.A. at 1000.)  Such proof can come from letters from other treatment facilities or social service agencies or probation/parole officers, jails, courts, and/or parents. *Id*.  As discussed above, testimony at trial indicated that the types of individuals admitted into Plaintiff's programs would include persons who are unable to work and "function" because of their addiction, and who, according to documentary evidence, may not have been able to do so for at least a year.  Therefore, we agree with the district court that notwithstanding the mitigating effects of the methadone on Plaintiff's potential clients, Plaintiff nevertheless would prevail inasmuch as it has shown that its potential clients have a record of a disability. *Hilburn,* 181 F.3d at 1229; *see also Ambrosino v. Metropolitan Life Ins. Co.*, 899 F.Supp. 438, 442 (N.D. Cal. 1995) (rejecting argument that plaintiff was not disabled because he had no current impairment since he was working in an exemplary manner in his profession; such an argument fails to take into account that the definition of disability expressly includes having a record of a past impairment or being considered to have one).

Likewise the district court found that Defendants regarded Plaintiff's potential clients as being disabled. The third prong of the disability statutory provision defining disability is meant to cover those who do not presently suffer from a substantially limiting impairment, but are regarded as having such an impairment. *Henderson v. Ardco, Inc.*, 247 F.3d 645, 649-50 (6th Cir. 2001) (noting that plaintiff abandoned claim of actual disability and focused on claim that she was regarded as being disabled).

recovering drug addicts among those to be protected under the ADA, Congress recognized "that many people continue to participate in drug treatment programs long after they have stopped using drugs illegally, *and that such persons should be protected under the Act.*" H.R. Conf. Rep. No. 101-596, at 64, reprinted in 1990 U.S.C.C.A.N. 267, 573 (emphasis added). Congress recognized that well after drug addicted individuals have recovered from the effects of their drug addiction by participating in drug treatment programs, such as the one at issue in this case, these individuals might still face discrimination and be entitled to protection under the ADA. *Id*. Consequently, we cannot agree with Defendants, that in the context of a drug addiction impairment, merely because methadone has the intended effect of ameliorating the addiction, recovering drug addicts lose all protection under the ADA. The statute itself belies any such contention.

We also cannot agree with Defendants that the district court failed to consider the mitigating effects of methadone. While the district court did not engage in an extensive analysis of the mitigating effects of the drug, it recognized that because of methadone treatment, the results of the disability or impairment of drug addiction "may be transitory." *See MX Group*, 106 F. Supp. 2d at 918. It then went on to explain, however, that regardless of such a finding, Plaintiff will still prevail because "drug-addicted individuals can be shown to have a record of or are regarded as having a disability." *Id*. (citing 42 U.S.C. § 12102(2)(B), (C)) (internal citation marks omitted). We agree.

A record of an impairment means an individual has "a history of, or has been misclassified as having, a mental or physical impairment that substantially limits one or more major life activities." *See* 28 C.F.R. § 35.104(3). To succeed

---

engaging in such use; (2) is participating in a supervised rehabilitation program and is no longer engaging in such use; or (3) is erroneously regarded as engaging in such use but is not engaging in such use . . . ." 42 U.S.C. § 12210(b).

We find the Second Circuit's reasoning persuasive. Because Plaintiff has presented evidence that it was denied a zoning permit because it cares for and/or associates with individuals who have disabilities, Plaintiff has standing to bring this suit on its own behalf. *Innovative*, 1117 F.3d at 47. To that end, Defendants' reliance on *Hunt*, 432 U.S. 333, is misplaced. As explained above, in that case, the Supreme Court outlined specific factors that a plaintiff who is suing *on behalf of its members* must show in order to assert standing. *Id*. at 343. However, in the instant case, Plaintiff is not an association suing solely on behalf of its members. Instead, it is an entity suing primarily on its own behalf, because of injury it suffered as a result of its association with individuals with disabilities. *Pathways Psychological Support Center v. Town of Leonardtown*, No. Civ.A. DKC 99-1362, 1999 WL 1068488, at *3 n.4 (D.Md. July 30, 1999) (rejecting similar argument and holding that mental rehabilitation facility that was refused permission to operate in town had standing to sue where the denial allegedly was based on the facility's association or relationship with its clients).

Defendants, however, contend that Plaintiff still lacks standing to bring this suit because it failed to join a member or potential member of the clinic. Defendants argue that the Supreme Court has held that an individual inquiry is necessary in order to determine whether an individual has a disability. *See e.g., Sutton*, 527 U.S. at 483 ("the definition of disability . . . requires that disabilities be evaluated with respect to the individual and be determined based on whether an impairment substantially limits . . . major life activities"). *Sutton* involved an employment discrimination case where the plaintiffs alleged that they had been discriminated against because of their poor eyesight. *Id*. at 475. The plaintiffs argued that their claims of disability, which resulted from extreme myopia, should be analyzed regardless of whether their glasses or contact lenses mitigated the effects on their disability. *Id*. Rejecting this argument, the Supreme Court held that "if a person is taking measures to correct for, or mitigate, a physical or mental impairment, the effects of those

measures--both positive and negative--must be taken into account when judging whether that person is 'substantially limited' in a major life activity and thus disabled under the [ADA]" *Id*. at 482. In its analysis, the Supreme Court also noted that the ADA defines disability as "a physical or mental impairment that substantially limits one or more of the major life activities" *Id*. citing (42 U.S.C. § 12102(2)(A)). The Court stated that "because the phrase 'substantially limits' is presented in the present tense, it must be read as requiring a person to be presently—not potentially or hypothetically—substantially limited in order to demonstrate disability." *Id*. In addition, "[t]he definition of disability also requires that disabilities be evaluated with respect to an individual." *Id*. at 483. Thus, whether a person has a disability under the ADA is an individualized inquiry. *Id*.

Based on *Sutton's* holding that an individual's disability requires an individualized inquiry, Defendants argue that Plaintiff's claim fails because it failed to join one of its potential clients in order that such an individual could be assessed to be disabled. If no individual client can be assessed based on his or her disability, then Defendants contend that they cannot be held to have discriminated against Plaintiff because it associated with disabled persons. Defendants acknowledge that the Second Circuit in *Innovative* held that the plaintiff organization in that case had standing to bring claims based on the discrimination it faced, but Defendants here assert that the case is distinguishable because in *Innovative* the IHS joined opiate addicts in its complaint. However, *Innovative* is distinguishable in that the plaintiff in that case was not attempting to establish a completely new clinic in a new area but rather was attempting to relocate its existing clinic to a new site.

Under the facts of this case, we believe that to overturn the district court's disposition in Plaintiff's favor on the basis that an individualized inquiry of a client is needed would defy reason as Plaintiff has presented evidence that it was altogether foreclosed from opening its clinic in the first place

negative effects of any mitigating factors must be considered. *Id*. at 484. Defendants contend that because of the mitigating effects that methadone has on an addict's condition, Plaintiff's potential clients cannot show a substantial impairment of a major life activity, which requires an assessment of the severity and long-term impact of the impairment. Defendants essentially argue that the methadone makes transitory any substantially limiting impairment suffered by Plaintiff's potential clients. *See Williams*, 122 S.Ct. at 691 (explaining that the impairment's impact on major life activities must be long-term).

According to Plaintiff's literature, methadone generally has the following side effects: lightheadedness, dizziness, sedation, nausea, vomiting , sweating, ankle edema and skin rash. (J.A. at 902.) The literature also states the side effects are short lived. *Id*. At trial, McNeil testified that it takes most clients between two to four weeks to function normally. Although she did not explain what "function normally" means, it apparently means that at least some clients would be able to work or do other activities that most people do on a daily basis, within two to four weeks. However, Plaintiff points to evidence in the record that drug addiction is often fraught with instances of relapse, and that programs such as Plaintiff's are not a magic cure to drug addiction, which can take years to cure. Where drug addition is concerned, the time in which an individual recovers, including "the possibility of relapse" factors into a consideration of whether the impairment is long term. *United States v. Borough of Audubon*, 797 F.Supp. 353, 359 (D. N.J. 1991). Indeed, the statute itself contemplates that individuals participating in drug rehabilitation programs, who are no longer using drugs or presumably impaired by their effects, are covered by the Act. See 42 U.S.C. § 12210(b).[3] Moreover, by including

---

[3]This Section provides that a person is not excluded under the ADA where he or she: "(1) has successfully completed a supervised drug rehabilitation program and is no longer engaging in the illegal use of drugs, or has otherwise been rehabilitated successfully and is no longer

Similarly, in the instant case, in order to be admitted into Plaintiff's facility, Plaintiff's potential clients would have to show that they have been suffering from a drug addiction for at least a year. Moreover, Fabian testified that narcotics addiction, "necessarily includ[ed]" impairments as to employability, parenting, and functioning in everyday life. (J.A. at 200.) Thus, there would have to be evidence that narcotics addiction limits these "major life activities,"and that Plaintiff's potential clients necessarily would suffer from such limitations.[2] Although the ADA states that the impairment must "substantially" limit the major life activities, the requirement does not mean that Plaintiff must show an utter incapability to work, parent or function socially in every day life, but only that these "significant limitations result from the impairment." *Bragdon v. Abbott*, 524 U.S. 624, 641 (1998); *see also Gillen v. Fallon Ambulance Service, Inc.*, F.3d 11, 22 (1st Cir. 2002) ("[W]hen an impairment results in significant limitations, that impairment is substantially limiting even if the limitations are not insurmountable.").

Defendants also argue that the district court failed to consider the mitigating effects of methadone in determining whether Plaintiff's potential clients possess a disability. In *Sutton*, the Supreme Court held that in determining whether a person is disabled, consideration should be given to measures that mitigate the impairment. *Sutton*, 527 U.S. at 475. For instance, in *Sutton*, the Supreme Court held that the fact that the vision of both plaintiffs was correctable with glasses or contact lenses was a factor to be considered in determining whether their impairment constituted a disability under the ADA. *Id*. The Court further held that positive or

---

[2] That Plaintiff's potential clients necessarily would be limited in these major life activities is further bolstered by the fact that Fabian testified that Plaintiff planned to implement various programs to help potential clients deal not only with their drug addiction but also with the problems that accompany the addiction, such as employment-related problems, as the addiction will "usually affect all facets" of an addict's life. (J.A. at 199-200.)

because of the substance abuse services it planned to offer to its potential clients and that Defendants discriminated against it on that basis. To that end, as explained below, Plaintiff has submitted sufficient proof that its potential clients qualify as disabled under the ADA. *See Regional Econ. Action Program, Inc. v. City of Middletown*, 281 F.3d 333, 344-46 (2d Cir.), *opinion corrected and superseded,* 2002 WL 449493 (2d Cir. Feb. 19, 2002) (reversing grant of summary judgment as to organization's ADA claims, after it presented evidence that defendants denied it a permit to open halfway houses for its proposed clients, recovering alcoholics, whom evidence showed were disabled under ADA).

### Plaintiff's Potential Clients Are Disabled under the ADA

The ADA provides that

The term "disability" means, with respect to an individual--
(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual;
(B) a record of such an impairment; or
(C) being regarded as having such impairment.

42 U.S.C. § 12102.

To determine whether an individual is disabled under subsection A, the Supreme Court has stated that courts should determine whether an individual has a mental or physical impairment that substantially limits a major life activity. *Bragdon v. Abbott*, 524 U.S. 624, 632 (1998). Drug abuse can constitute such an impairment. *Id*. at 632-33 (explaining that commentary accompanying the Department of Health, Education and Welfare's regulations interpreting the Rehabilitation Act includes drug addiction and alcoholism as a physical impairment); *Regional Econ.* 281 F.3d at 344 (collecting cases that hold alcoholism and drug addiction

constitute a mental and physical impairment under both ADA and Rehabilitation Act). As the Second Circuit pointed out, "[l]egislative history supports this conclusion." *Id*. at 345 (citing H.R. Rep. No. 101-485(II), at 51 (1990), *reprinted in* 1990 U.S.C.C.A.N. 303, 333 (physical or mental impairment includes drug addiction)).

In the instant case, Plaintiff presented evidence that its potential clients are recovering drug addicts. Plaintiff further submitted evidence that to become a member of its program, individuals had to show they had been addicts for at least a year. They could go about this by presenting letters from employers, a parent, or a parole or probation officer or through blood tests. (J.A. at 180.)

However, merely having an impairment does not make one disabled for purposes of the ADA; a plaintiff must also show the impairment substantially limits a major life activity. *Toyota Motor Manuf., Kentucky, Inc. v. Williams*, 122 S.Ct. 681, 690 (2002). Such an inquiry must be made on a case-by-case basis. *Id*. at 691-92. In *Williams*, the Court stated that it is not enough that someone presents evidence of a medical diagnosis of an impairment. *Id*. at 691. ADA requires those "claiming the Act's protection . . . to prove a disability by offering evidence that the extent of the limitation [caused by their impairment] in terms of their own experience . . . is substantial." *Id*. at 691-92 (citation and internal quotation marks omitted). "That the Act defines 'disability' 'with respect to an individual,' . . . makes clear that Congress intended the existence of a disability to be determined in such a case-by-case manner." *Id*. (citations omitted).

Major life activities constitute tasks central to most people's daily lives. *Id*. at 693. According to the regulations implementing Title II, major life activities include such functions as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working. 28 C.F.R. § 35.104. This list is merely illustrative and not exhaustive. *Bragdon*, 524, U.S. at 639. At trial,

Fabian testified that narcotics addiction impairs such functions as "[p]arenting, employability, regular life functioning, social productive functioning in everyday life, and staying out of jail." (J.A. at 200.) Although she failed to explain what regular life functioning or social productive functioning means, we note that it has been held that "interacting with others," is a major life activity. *See McAlindin v. County of San Diego*, 192 F.3d 1226, 1233 (9th Cir. 1999). Keeping in mind that the list of major life activities provided in the C.F.R. is not exhaustive, it should be noted that Plaintiff adduced evidence below to show that drug addiction affects the major life activities of working, functioning socially and parenting. *See Bragdon*, 524, U.S. at 639.

In *Regional Econ.*, the Second Circuit allowed a claim brought under the ADA to proceed in a situation somewhat analogous to the one at bar. In that case, the Second Circuit analyzed the issue of disability in terms of a facility's potential clients, where the facility was denied a special use permit to open halfway houses for recovering alcoholics. *Regional Econ.*, 281 F.3d at 345. The Second Circuit recognized that an individualized inquiry had to be made regarding whether Regional Economic Community Action Program (RECAP) clients were disabled, and that merely concluding that they suffered from alcohol or drug addiction was not enough to trigger the protections of the ADA or the Rehabilitation Act. *Id*. ("mere status as an alcoholic or substance abuser does not necessarily imply a 'limitation' under the second part of that definition"). The impairment must also show a substantial limitation in one or more major life activity. *Id*. The Second Circuit addressed the problem by looking at the fact that pursuant to New York statutory law, in order to qualify for admission to a halfway house, a resident must meet certain criteria that "limit[s] their ability to live independently and to live with their families." *Id*. at 346. In other words, the individuals must be subject to a substantial limitation in the major life activity of caring for themselves. *Id*.