Wendy Hobbs EDWARDS, Plaintiff,

v.

**FORD MOTOR COMPANY,
et al., Defendants.**

**Civil Action No. 3:98CV–627–H.**

United States District Court,
W.D. Kentucky,
At Louisville.

Aug. 29, 2002.

Ruby D. Fenton–Iler, Pitt, Fenton & Smith, Louisville, KY, for plaintiff.

J. Michael Brown, Sr., Wyatt, Tarrant & Combs, Louisville, KY, for defendants.

## MEMORANDUM OPINION

HEYBURN, Chief Judge.

In October 1998, Plaintiff, Wendy Hobbs Edwards ("Edwards"), filed this lawsuit seeking damages for alleged employment discrimination. Four years, several hearings, and multiple opinions later, the Court has dismissed each of Plaintiff's claims.[1] Plaintiff now moves the Court to reinstate her disability claim, previously dismissed in a Memorandum Opinion dated February 14, 2002. In her motion, Plaintiff raises a valid point that the Court has yet to consider her "regarded as" disabled claim under the Americans with Disabilities Act ("ADA"). Once again, the factual and legal issues are difficult. The relevant facts

1. On October 10, 2001, the Court granted summary judgment to Defendant Ford Motor Company ("Ford") on Plaintiff's claim under the Family Medical Leave Act ("FMLA"), and to Defendant International Union of United Automobile Workers and its Local 862 ("Unions") on Plaintiff's claim for breach of the duty of fair representation under Section 301 of the Labor Management Relations Act ("LMRA"). On December 12 of that same year, the Court granted summary judgment to Ford on Plaintiff's LMRA claim, but denied summary judgment on Plaintiff's disability claim under the ADA. On February 14, 2002, the Court granted Ford's motion to reconsider and, on the basis of intervening Supreme Court precedent, granted summary judgment to Ford on Plaintiff's disability claim.

are set forth in earlier opinions. The Court will recount briefly only those issues implicated by the present motion.

## I.

All Plaintiff's arguments are directed toward establishing a *prima facie* case under any part of the ADA. *See Parry v. Mohawk Motors of Michigan, Inc.,* 236 F.3d 299, 310 (6th Cir.2000). Of the five elements necessary to do so, *see Swanson v. Univ. of Cincinnati,* 268 F.3d 307, 314 (6th Cir.2001), only two were disputed: whether Plaintiff was "disabled" under the ADA, and whether she requested from Ford a reasonable accommodation. Retracing some old ground puts Plaintiff's latest arguments in context.

In its December 2001 Memorandum Opinion, the Court found that Plaintiff's Graves' disease qualified as a physical impairment that substantially affected her major life activities of sleeping and caring for herself. *See* (Mem. Op. (12/12/01) at 5–10.) In so finding, the Court had to rely on, *inter alia,* unauthenticated documents that may have been inadmissible had Ford objected to them.[2] Next, as to the Plaintiff's assertion that she timely sought a reasonable accommodation by requesting an extended medical leave of absence before the deadline in the five-day quit notice, the Court stated that "Plaintiff's efforts to establish this crucial element of her claim may be described as careless at best." *Id.* at 11. The evidence Plaintiff cited in support of her averment that she twice faxed Ford to ask for a leave extension consisted of unauthenticated hand-written notes attached to an affidavit that was itself inadmissible.[3] Nevertheless, the Court searched Plaintiff's deposition testimony for (and located) references to her purported efforts to satisfactorily respond to the five-day quit notice. Although Plaintiff did not herself send the faxes, the Court found that a reasonable jury could infer that if she had others do so, Ford received them.

After Ford articulated a legitimate, nondiscriminatory business reason for firing Plaintiff, the burden returned to Plaintiff to demonstrate that Ford's stated reason was a mere pretext for discrimination. The Court ruled that if a jury were to conclude that Plaintiff timely requested additional leave, then it could also find that Ford's proffered reason for firing her had no basis in fact. In conclusion, the Court stated that "there exists a genuine issue as to the material fact of whether Defendant's justification for terminating Plaintiff—it was required to do so by the [collective bargaining agreement ("CBA") ]—was a pretext for discriminating against her on the basis of her disability." *Id.* at 15.

Soon thereafter, Ford filed a motion for reconsideration. While this motion was pending, the Supreme Court issued *Toyota Motor Manuf., Kentucky, Inc. v. Williams,* 534 U.S. 184, 122 S.Ct. 681, 151 L.Ed.2d 615 (2002), which refined its prior ADA jurisprudence and emphasized that plaintiffs must introduce individualized evidence that tends to prove that the limitation caused by their impairment is substantial. The Court reexamined all of

---

**2.** The Court also notes that its finding was made despite Plaintiff's erroneous arguments regarding both Supreme Court precedent addressing the effect of mitigating measures (such as medication) upon an individual's claimed limitations and Sixth Circuit precedent stating that an individual must establish she was disabled at the time of the discriminatory act as well as at present.

**3.** The Court also pointed out that even if the affidavit—which was neither notarized nor sworn—had been admissible, it made no reference to the information in the exhibits, as required by Rule 56(e), and Plaintiff was not the proper affiant because she had no personal knowledge about the actions described in the exhibits.

Plaintiff's evidence, including that submitted by her in response to Ford's motion for reconsideration, and found that she had not adequately established that her Graves' disease substantially limited her life activities of sleeping and caring for herself. Indeed, the voluminous record contained only five cursory and intermittent references by Plaintiff to insomnia. *See* (Mem. Op. (2/14/02) at 4.) Her materials did not include any of the following: medical diagnoses or history of treatment for insomnia, allegations that her sleep deprivation was a persistent or permanent problem, or even any statements by Plaintiff explaining the adverse effects of her impaired ability to sleep. Furthermore, the Court found that Plaintiff's purported inability to care for herself was not supported by a single detailed allegation as to which tasks she is unable to perform. *See id.* at 5. Therefore, on reconsideration, the Court dismissed Plaintiff's disability claim.

■ Plaintiff has now filed her own motion for reconsideration. "Motions to alter or amend judgment may be granted if there is clear error of law, newly discovered evidence, an intervening change in controlling law, or to prevent manifest injustice." *GenCorp, Inc. v. Am. Int'l Underwriters,* 178 F.3d 804, 834 (6th Cir. 1999) (internal citations omitted). Plaintiff contends that her motion qualifies under three of these categories, and advances two arguments in support. First, she claims that the Court committed a clear error of law by not considering her arguments that she has a record of or was regarded as being disabled by Ford. Second, she asserts that "to prevent manifest injustice Plaintiff must be allowed to present evidence under the new proof standards set out in *Williams* which created an intervening change in controlling law." (Pl.'s Mot. at 6.) The Court will address her latter argument first.

## II.

■ Plaintiff has attached to her motion for reconsideration a new affidavit addressing her insomnia and its effects. She asserts that this new affidavit provides the detailed evidence necessary to satisfy *Williams'* heightened evidentiary standard. Plaintiff acknowledges that courts typically will consider additional evidence accompanying a Rule 59(e) motion only when it has been newly discovered, and that "[t]o constitute 'newly discovered evidence,' the evidence must have been previously unavailable." *GenCorp,* 178 F.3d at 834. She also concedes that the information in the affidavit does not so qualify. Nevertheless, she argues that when evidence was not required under the prior standard, but has only recently become relevant and necessary, it may be considered now regardless of whether it was newly discovered. The Sixth Circuit has not adopted this exception to the general rule. Nevertheless, even if it were to do so, the Court would not apply it here.

■ Simply put, it is implausible for Plaintiff to claim that evidence demonstrating the extent of her insomnia has only recently become relevant and necessary. Disability discrimination suits are, by their very nature, fact intensive claims. This evidence was always relevant, regardless of *Williams.* Even before the Supreme Court's decision, at every stage of this case Ford has vehemently challenged—and this Court has identified—the paucity of Plaintiff's evidence, due in large part to the lack of care exercised in her attempts to introduce it. Moreover, Plaintiff's claim to have not had "notice" that *Williams* required more evidence than she had already submitted does not withstand a review of the prior pleadings. Ford's January 10, 2002, letter brief quoted *Williams* at length and argued that Plaintiff had not sufficiently shown that her

Graves' disease substantially limited her claimed major life activities. Plaintiff filed a response memorandum that devoted over three pages to disagreeing with Ford's interpretation of *Williams,* and reattached an inch worth of exhibits in support. Plaintiff may have misread *Williams,* or she may have misjudged the strength of the evidence she had produced. Neither hypothesis, however, supports the argument that detailed evidence of Plaintiff's insomnia was heretofore irrelevant or unnecessary.

This rule is not one which is applied mechanically and without sound reasons. Even a brief glance at Plaintiff's affidavit reinforces the validity of the rule that evidence must be newly discovered to be admissible on a motion for reconsideration. For example, in this new document Plaintiff asserts that for the last six years she has averaged no more than three hours of sleep per night, and no more than two hours of uninterrupted sleep. Nothing even remotely approaching such an extraordinary claim of sleeplessness was reflected in Plaintiff's earlier exhibits. Assuming Plaintiff has, as alleged, suffered from insomnia for so long and so severely, this information was both available and relevant since the date that she commenced her suit. Plaintiff's attempt to introduce this evidence only after her claim has been dismissed fatally undermines its credibility. The limitation on Rule 59(e) submissions was designed to avoid precisely this sort of reconstruction of past events. *See, e.g., Huff v. Metro. Life Ins. Co.,* 675 F.2d 119, 123 (6th Cir. 1982) ("we find no abuse of discretion in the district court's determination that the evidence [submitted as part of Rule 59 motion] would not be considered because it was not newly discovered and its credibility was doubtful").

*Williams* did effect an intervening change in controlling law. However, to allow the use of Plaintiff's affidavit now would be unfair and contrary to the letter and spirit of Rule 59(e). In the exercise of its discretion, therefore, the Court will not consider this affidavit for the purpose of deciding the pending motion. Without the affidavit, Plaintiff's motion for the Court to alter or amend its judgment on this ground fails.

### III.

Plaintiff's second argument for reconsideration is that the Court was wrong to dismiss her entire claim without ruling on all of her alternative arguments that she was "disabled" under the ADA. Plaintiff makes a valid point and the Court will explain why.

The ADA defines disability as: "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such impairment; or (C) being regarded as having such an impairment." *Bragdon v. Abbott,* 524 U.S. 624, 630, 118 S.Ct. 2196, 141 L.Ed.2d 540 (1998) (quoting 42 U.S.C. § 12102(2)). The Court stated in its December 2001 opinion that "Plaintiff argues that she qualifies under each of categories (A), (B), and (C), but the Court deems it necessary only to examine her eligibility under (A)." (Mem. Op. (12/13/01) at 5.) The Court did not examine Plaintiff's claims under subsections (B) and (C) because in that opinion it found that Plaintiff had demonstrated that her Graves' disease substantially limited her major life activities of sleeping and caring for herself; i.e., she had sufficiently stated a claim under subsection (A). Later, in February 2002, when the Court reconsidered its prior judgment and held that Plaintiff was not disabled under § 12102(2)(A), it did not discuss Plaintiff's claims under subsections (B) and (C). These claims always appeared secondary

and had not been the focal point of Plaintiff's briefing. Simply put, the subsections (B) and (C) claims were "lost in the shuffle." Plaintiff is absolutely correct that the Court has yet to consider whether she has a record of or was regarded as being disabled. She is entitled to consideration on these claims.

### A.

■ Record of impairment claims under 42 U.S.C. § 12102(2)(B) seem to be a little used and even less discussed aspect of ADA jurisprudence. "A record of impairment means an individual has 'a history of, or has been misclassified as having, a mental or physical impairment that substantially limits one or more major life activities.'" *MX Group, Inc. v. City of Covington*, 293 F.3d 326, 339 (6th Cir.2002) (quoting 28 C.F.R. § 35.104(3)). "Regardless of whether [Plaintiff] is proceeding under a classification or misclassification theory, the record-of-impairment standard is satisfied only if she actually suffered a physical impairment that substantially limited one or more of her major life activities." *Hilburn v. Murata Elec.'s N. Am., Inc.*, 181 F.3d 1220, 1229 (11th Cir.1999). "The impairment indicated in the record must be an impairment that would substantially limit one or more of the individual's major life activities." *Id.* (quoting 29 C.F.R. pt. 1630, App. § 1630.2(k) (1997)). In other words, claims under § 12102(2)(B) (based upon a record of impairment) would appear to succeed or fail for many of the same reasons as claims under § 12102(2)(A) (based upon an actual impairment), because both require a predicate showing of a mental or physical impairment that substantially limits one or

more major life activities. *See id.; Colwell v. Suffolk County Police Dep't*, 158 F.3d 635, 645 (2nd Cir.1998).

Plaintiff argues that Ford possessed within its files numerous documents detailing her history of Graves' disease and its deleterious effects on her health. Be that as it may, the Court has already determined that Plaintiff may not proceed with her § 12102(2)(A) actual disability claim because her Graves' disease did not substantially limit her major life activities of sleeping and caring for herself. That Ford may have had extensive paperwork describing her illness does not transform the degree to which this impairment was substantially limiting so that Plaintiff may pursue a viable § 12102(2)(B) record of disability claim.[4]

### B.

■ Plaintiff's § 12102(2)(C) claim—that Ford regarded her as disabled—is not quite so clear. This provision "is meant to cover those who do not presently suffer from a substantially limiting impairment, but are regarded as having such an impairment." *MX Group*, 293 F.3d at 340. There are two ways in which individuals are regarded as disabled for the purposes of the ADA: "(1) a covered entity mistakenly believes that a person has a physical impairment that substantially limits one or more major life activities, or (2) a covered entity mistakenly believes that an actual but nonlimiting impairment substantially limits a major life activity." *Id.* Under either scenario, claimants must show that their employer entertained misperceptions about them and their assumed (but nonex-

---

**4.** Plaintiff's § 12102(2)(A) actual disability claim was evaluated under the standards announced in *Williams,* in which the Supreme Court itself examined an actual disability claim under that same provision, and not a record of disability claim under § 12102(2)(B). Nevertheless, this Court cannot perceive any reason why *Williams* would not apply also to claims brought under the companion statutory provision of subsection (B).

istent) or actual (but misunderstood) impairment. *See id.* For this reason, a court's focus in a regarded as claim is not upon the individual alleging discrimination, but instead is upon the state of mind of the employer. *See id.*

■ The crux of Plaintiff's claim is as follows. In 1998, approximately two years after her termination, Ford allegedly requested (via the Union) that Plaintiff provide certain documentation of the circumstances of her termination, as well as her current medical status. According to Plaintiff, Ford's actions indicate that it regarded her (then and in September 1996) as disabled; i.e., by demanding proof that Plaintiff's Graves' disease would not interfere with her work abilities, Ford must have perceived that her illness was substantially limiting.

In so arguing, Plaintiff relies heavily on a recent decision of the Sixth Circuit, *Henderson v. Ardco, Inc.,* 247 F.3d 645 (6th Cir.2001). Henderson was an assembly line welder who was injured in July 1994. In February 1995, her doctor approved her return to work, but with restrictions as to her lifting. The plant manager refused to reinstate Henderson, telling her: "You know what company policy is . . . you have to be 100 percent to work here." *Id.* at 647. In July 1995, Henderson requested any work not proscribed by her restrictions, but Ardco told her that no such position existed. However, documents describing the requirements of different Ardco jobs indicated that Plaintiff's restrictions arguably did not disqualify her from certain posts. The trial court disapproved of the "100% healed rule," but granted summary judgment to Ardco, holding, *inter alia,* that Ardco did not misperceive Henderson's true condition, and thus did not regard her as disabled.[5]

The Sixth Circuit reversed. The panel noted that there were two ways to interpret the plant manager's statement that "there is not a job in the plant that her restrictions would not bump into." *Id.* at 651. "One way, more favorable to the defendant, is that the written job descriptions are incomplete and that the reality of the shop floor is that the workers" will actually have to perform tasks from which Henderson was restricted, "or at least that physical requirements are significantly understated by their written descriptions." *Id.* On the other hand,

> a second reading of [the plant manager's] view is that he considers someone with physical restrictions unable to 'make it' doing factory work, even if it is within the technical requirements of the worker's restrictions, and/or that he considers it too risky or problematic to employ workers with whom he has to be cautious not to push much beyond the essential function of their job. This latter interpretation broadens the scope of the perceived disability and if proven, could constitute disability discrimination.

*Id.* The remainder of *Henderson* is devoted largely to a discussion of the breadth of the class of jobs an employer must perceive the employee is unable to perform, an issue subsequently addressed by the Supreme Court in *Williams.* In the present case, there is no real dispute on this point. Neither Edwards nor Ford allege that Ford perceived her as qualified for certain positions but not others.

Instead, Edwards' claim is that Ford perceived her Graves' disease to bar her from working in *any* job at the facility. She argues that Ford applied a 100% rule to exclude her from all jobs at its plant, and thus perceived her as disabled under the circumstances described in *Henderson.*

---

**5.** The district court also found that Henderson was not actually disabled insofar

as her injury did not substantially limit her in any major life activities. *See id.* at 649.

The plaintiff there argued that the "100% healed" rule was *per se* violative of the ADA because it precluded the ADA's mandatory individual assessment for her position. The Sixth Circuit partially disagreed, stating:

> This foreshortens the inquiry ... [a]ll courts that have examined the question ... agree that a 100% rule is impermissible as to a *disabled* person—but one must first be disabled. On summary judgment, though, the importance of the 100% rule is its role in determining the threshold issue of perceived disability. Where the 100% rule is applied to mildly impaired persons to exclude them from a broad class of jobs, it may be treating them as disabled even if they are not, thereby qualifying them for protection under the ADA and parallel statutes, and activating the individual assessment rule. The variability of the impairment-relevant job requirement within the business applying the 100% rule is thus important, because it indicates the breadth of the class the employer perceives when the employer applies the rule.

*Id.* at 653 (internal citations omitted). *Henderson* may control our case if the evidence suggests that Ford applied a 100% healed rule to Plaintiff even though she could perform some of the available jobs.

Plaintiff has only two evidentiary bases for claiming that Ford applied a 100% rule as in *Henderson*. The first involves a conversation she had with a union official in November 1997. Plaintiff's complaint alleges that at this time, approximately thirteen months after Ford had terminated her, "the Union contacted Plaintiff and told her that the grievance was 'on hold,' but that if she could prove that she was well and able to work by providing pay stubs from her new employer showing actual hours worked, she might be considered for reinstatement." (Pl.'s Compl. at

¶ 25.) Plaintiff's deposition testimony and her narrative state the same facts. (*See* Edwards' Dep. at 68; Pl.'s Narrative at 00021.) The Court finds that this testimony is inadmissible to prove a statement of Ford or a policy of Ford. First, the union official does not make clear whether the request comes from the Union or Ford. Moreover, the union official does not identify the maker of the alleged statement. Without knowing the maker one cannot judge the credibility or reliability of the evidence. Finally, the alleged statements are so vague about "considering reinstatement" that they do not support the finding of a "100% healed" policy such as *Henderson*. This testimony is double hearsay. It contains only the vaguest assertion against Ford's interest. It contains no foundation of reliability or credibility upon which one could assess its truth. Such testimony would not be admitted at trial.

Somewhat more direct evidence is a letter from Plaintiff to her doctor dated August 7, 1998, in which Plaintiff lists information which Ford has requested. *See* (Ex. 25, Pl.'s Resp. to Ford's Mot. for Summ. J. (Aug. 10, 2001).) At least, as to these statements, Plaintiff can assert that Ford made the request, although she never says who made them. The letter states:

The items Ford is requesting are as follows:

1. A copy of my billing from August 1996–October 1996.

2. A doctor's statement verifying that I am suited for industrial employment. They would like it to be specific in the following ways:

 a. Am I physicall[y] well enough to do industrial work?

 b. What is my general health in regards to Graves Disease?

 c. Do I have any restrictions?

d. What is the prognosis of the disease?

e. Have I been in for treatment for Graves since October 1996?

f. Have I had a recurrance [sic] of the symptoms, such as viral infections, facial swelling, etc. since October 1996?

g. Anything else that would help to prove that I am well.

3. A copy of what was faxed from your office on September 12, 1998. They have a copy of the note submitted by your assistant that said medical information had been faxed, but they specifically want the form that was faxed.

4. A copy of your phone record verifying a fax was sent.

5. A medical release form so they can review my records.

6. Documentation to prove the original date of medical leave. They are unsure if the leave was through September 12th or 13th, 1996.

*Id.* According to Plaintiff, Ford's request for information on her past and present medical condition, including whether her Graves' disease restricted her working abilities, tends to show that it regarded her as disabled. Quite frankly, the Court does not follow this logic.

Our case is quite different from *Henderson*. In *Henderson*, the employer had a clearly articulated "100% healed" rule. Plaintiff presents no evidence that Ford had such a rule which it applied to Plaintiff's restrictions to prevent her from gaining employment. Plaintiff has no evidence of how Ford may have perceived her limitations in September 1996. Ford knew that Plaintiff was affected by Graves' disease between 1994 and 1996. However, nothing in the record suggests how Ford perceived her limitations at that time or that Ford misperceived the nature of her Graves' disease.

Plaintiff's only evidence concerns a request almost two years after the alleged disability discrimination. In *Henderson*, the employer believed that the plaintiff could not perform any of the available jobs and assumed that its employees were disqualified from work unless shown that they were "100% healed." *Id.* at 647. Quite to the contrary, Ford's request for information in August 1998 says little about how it may have perceived Plaintiff's limitations in September 1996. To seek information about Plaintiff's medical condition and her physical abilities at the time Ford was contemplating her reinstatement in 1998 would seem only necessary and prudent. Ford could not know whether to rehire her or how to accommodate her without asking such questions. Such questions reflect quite the opposite perception from that held by Henderson's employer, Ardco. Ford's questions reflect the absence of knowledge about Plaintiff's condition, rather than the existence of a misperception.

More important, but perhaps less easily expressed, is the sense that Plaintiff's claim is not of the type Congress envisioned when it enacted the ADA to combat disability discrimination. According to the EEOC, the intent behind creating a cause of action for regarded as claims "is to reach those cases in which 'myths, fears and stereotypes' affect the employer's treatment of an individual." *Plant v. Morton Int'l, Inc.*, 212 F.3d 929, 938 (6th Cir. 2000) (quoting 29 C.F.R. § 1630.2($l$) App.). In *Henderson*, the plaintiff's employer directly informed her that it considered her back injury to disqualify her from working in any position within its plant. None of the evidence introduced by Plaintiff—on this or any other point—indicates that Ford harbored stereotypic assumptions

about Plaintiff's Graves' disease. In contrast, as the Court detailed in its October 2001 opinion addressing Plaintiff's FMLA claims, "not only is there no allegation that Ford ever denied Plaintiff leave to convalesce, but the record actually indicates that Defendant granted Edwards time off well beyond that which FMLA required." (Mem. Op. (10/10/01) at 7.) On multiple prior occasions, Ford provided Plaintiff with generous leave to seek treatment for her Graves' disease, and accepted her back each time without reservation. The only difference with Plaintiff's final leave, according to Ford, is that she failed to respond to the five-day quit notice, a fact that does not at all establish any misperception by Ford as to Plaintiff's disability.

The Court will enter an order consistent with this Memorandum Opinion.

## ORDER

Plaintiff has moved the Court to reconsider its February 14, 2002, Memorandum Opinion and Order granting summary judgment to Defendant on her disability discrimination claim, and reinstate its December 12, 2001, Memorandum Opinion and Order denying Defendant's motion for summary judgment on this same claim. The Court has thoroughly reviewed the memoranda of the parties as well as the testimony and exhibits of record, as well as elements of Plaintiff's claim that it had not previously ruled upon. Being otherwise sufficiently advised,

IT IS HEREBY ORDERED that Plaintiff's motion to reconsider is DENIED.