Almella STARKS–UMOJA, Plaintiff,

v.

FEDERAL EXPRESS CORPORATION, Defendant.

No. 01–2878 M1/A.

United States District Court, W.D. Tennessee, Western Division.

Dec. 30, 2003.

Julian Taylor Bolton, The Cochran Law Firm, Memphis, TN, for Plaintiff.

Matthew A. Vega, FedEx Corporation Legal Department, Memphis, TN, for Defendant.

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ORDER DENYING DEFENDANT'S MOTION TO DEEM DEFENDANT'S STATEMENT OF UNDISPUTED MATERIAL FACTS AS ADMITTED AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO STRIKE UNAUTHENTICATED EXHIBITS**

McCALLA, District Judge.

Before the Court is Defendant's Motion for Summary Judgment, filed April 1, 2003. Plaintiff responded in opposition on May 2, 2003. For the following reasons, the Court GRANTS Defendant's motion for summary judgment.[1]

## I. Motion to Deem Defendant's Statement of Undisputed Facts as Admitted

Plaintiff's initial Response to Defendant's Statement of Undisputed Material Facts, filed May 2, 2003, did not comply with Local Rule 7.2(d)(3). Plaintiff merely remarked "Disputed" in response to Defendant's statements without explaining the reasons for her disagreements and without referencing or attaching copies of the record in support of her positions. Defendant filed a motion to deem its statement of undisputed facts as admitted on May 12, 2003 due to Plaintiff's failure to properly respond.

Long after the time for responding to the summary judgment motion had expired, and after Defendant had filed the motion to deem its statement of material facts as admitted, Plaintiff filed her Amended Responses to Defendant's Statement of Undisputed Material Facts on June 27, 2003. Plaintiff maintained that Defendant's statement of material facts was too lengthy and she could not prepare a complete response within the time allotted. In that regard, the Court notes that the appropriate course of action would have been to request an extension of time, rather than filing an incomplete response that failed to comply with the local rules. However, in the interest of permitting Plaintiff to fully present her claims the Court has considered Plaintiff's late-filed

---

1. Defendant also filed a Supplemental Motion for Summary Judgment on July 25, 2003. In the supplemental motion, Defendant argues that Plaintiff should be judicially estopped from pursuing her disability discrimination claim because she failed to report this case as a potential asset in her personal bankruptcy case. Plaintiff responded in opposition to the supplemental motion on August 25, 2003. Because the Court has determined that it is appropriate to dismiss this case based on the substantive grounds presented in the first motion for summary judgment, the Court does not address the merits of the supplemental motion.

responses and the Court DENIES Defendant's motion to deem its undisputed facts as admitted.

## II. Motion to Strike Certain Exhibits

In her initial response to the motion for summary judgment, Plaintiff also failed to properly authenticate a number of the exhibits filed along with her response to Defendant's motion for summary judgment in accordance with the requirements of Federal Rule of Civil Procedure 56(e). Exhibits numbered 1, 2, 3, 4, 5, 7, 10, 12, 18, 19, 20, 22, 23, and 26 were not properly authenticated by the use of an affidavit or deposition testimony.[2] Wright, Miller & Kane, Federal Practice and Procedure: Civil 3d § 2722 (1998) ("To be admissible, documents must be authenticated by and attached to an affidavit that meets the requirements of Rule 56(e)."); *Federal Express Corp. v. United States Postal Serv.*, 75 F.Supp.2d 807, 815 (W.D.Tenn.1999). Defendant moved to strike these exhibits on May 12, 2003.

Plaintiff filed a response on June 27, 2003 and attempted to authenticate exhibits 1, 2, 3, 4, 5, 7, 10 and 20, which consist of a series of medical records, by reference to the deposition of Dr. Joel Reisman, an expert witness. Although Federal Rule of Evidence 703 permits Dr. Reisman to rely on these records from other physicians in formulating his opinion, the medical records from other physicians may not be admitted to the Court without proper authentication. The records were marked as exhibits during Mr. Reisman's deposition for identification purposes only and Defendant's counsel preserved an objection to their admissibility. (Reisman Dep. at 67–68.) The medical records are not properly authenticated by Dr. Reisman's deposition

and Plaintiff has offered no other indicia of authenticity.

Plaintiff also attempted to authenticate exhibit 18, which contains performance evaluations from 1982 through 1992, by reference to the deposition of Earl Potter. After reviewing Mr. Potter's deposition, it appears that Plaintiff's performance appraisals dating back to 1980 were discussed during the deposition, but do not appear to have been marked or attached as exhibits to the deposition. (Potter Dep. at 47–51.) Therefore, the Court has no indication that exhibit 18 contains the documents actually referenced during the deposition. Plaintiff also attached a letter indicating her attorney's receipt of her personnel file from Defendant. However, the copy of Plaintiff's personnel file is not actually attached to the letter submitted to the Court, nor has Plaintiff's attorney submitted a declaration that these are the documents received from Defendant during discovery. The Court has no indication that exhibit 18 contains the documents actually produced during discovery.[3] Thus, exhibit 18 has not been properly authenticated.

Plaintiff has attempted to authenticate exhibit 22, labeled FedEx Corporate Services Human Resource Policies June 12, 2000, exhibit 23, labeled FedEx Your Employee Benefits Book 2000, and exhibit 26, also labeled FedEx Corporate Services Human Resource Policies June 12, 2000, by arguing that Defendant produced these documents during discovery. Again, the Court has no indication that exhibits 22, 23, and 26 contain the documents actually produced during discovery.

■ If exhibits 1, 2, 3, 4, 5, 7, 10, 18, 20, 22, 23, and 26 were offered at trial without

---

2. Defendant also moved to strike exhibits 7 and 19 on the grounds that Plaintiff did not produce these documents in response to discovery requests.

3. The performance evaluations also do not include a FDX bates stamp number indicating that Defendant produced them during discovery.

more foundation, the Court would sustain Defendant's objections as to lack of authentication. On the motion for summary judgment, the Court has decided to consider the documents despite the lack of authentication. Defendant has not argued that the exhibits are inaccurate representations of the documents in issue, but has merely argued that Plaintiff failed to properly authenticate them. In the interest of fairly considering all of the evidence that Plaintiff contends supports her claims, the Court DENIES the motion to strike these exhibits.

■ However, Plaintiff has not attempted to authenticate exhibit 12 (a collection of e-mails and other documents) or exhibit 19 (several letters Plaintiff purportedly sent to Pete Potter, Lisa Jacobs, Laz Owens, and Sandra Marshall). Defendant maintains that it did not receive exhibit 19 from Plaintiff during the discovery process. Moreover, each of the purported recipients of the letters comprising exhibit 19 deny ever having received the letters. (Fowler Decl. 5/12/03 ¶ 6; Potter Decl. 5/12/03 ¶ 5; Owens Decl. 5/12/03 ¶¶ 4–5; Jacobs Decl. 5/12/03 ¶¶ 5–6.) Therefore, the Court GRANTS Defendant's motion to strike Plaintiff's exhibits 12 and 19.

4. Plaintiff claims to dispute many of the assertions in Defendant's Statement of Undisputed Material Facts. However, despite filing an amended response to explain her disputes to Defendant's Statement of Undisputed Material Facts, many of Plaintiff's responses constitute mere argument that fails to include citations to the record to support her objections. In particular, Plaintiff has objected to much of the testimony of Earl Potter and Laz Owens as self-serving, but has failed to offer any indication that their testimony is actually false or should be called into question. (*See, e.g.,* Plaintiff's Response to Defendant's Statement of Undisputed Material Facts ¶¶ 35, 36, 48, 53, 54, 71, 76, 78, 88, 89, 91, 110, 119, 129, 132.) Moreover, many of Plaintiff's objections are plainly baseless given the supporting documentation provided by Defendant and

## III. Background [4]

Plaintiff worked at Federal Express Corporation ("FedEx") from 1980 until her termination on November 8, 2000. (Def.'s Statement of Undisputed Material Facts [5] ¶ 29.) Her performance evaluations prior to 1993 reflect that she was viewed as an above average employee. (Pla.'s SUMF ¶ 4; Potter Dep. at 49–50.) She went on disability leave in 1994 due to bipolar disorder and breast cancer, for which she underwent a mastectomy in 1994. (Def.'s SUMF ¶ 32.) Plaintiff's cancer is currently in remission. (Def.'s SUMF ¶ 34.) At the time, the chemotherapy medicine Plaintiff took caused problems with the other medications she was taking. (Def.'s SUMF ¶ 33.) Plaintiff was on disability leave from 1994 until 1999. (Def.'s SUMF ¶ 32.) Dr. Anthony Jackson, then Plaintiff's physician, released her to return to work without restrictions. in January of 1999. (Def.'s SUMF ¶ 38.) Plaintiff returned to work without restrictions on January 18, 1999. (Def.'s SUMF ¶ 39.)

Pete Potter, Plaintiff's supervisor at FedEx beginning in late 1999, (Def.'s SUMF ¶ 47), issued Plaintiff a counseling letter for unsatisfactory work on several projects on November 23, 1999. [6] (Def.'s SUMF

the statements of Plaintiff's examining physicians that she could return to work. Without evidence to show a disagreement regarding the facts or create an inference that Plaintiff's view of the facts is correct, Plaintiff has not created a genuine issue of material fact and the Court accepts the facts as asserted by Defendant. Therefore, unless otherwise noted, the following facts are not materially disputed.

5. Hereinafter, "SUMF".

6. Plaintiff disputes this statement, but her dispute seems to be limited to the assertion that she did not receive the letter until sometime after November 23, 1999. (Pla.'s Resp. to Def.'s SUMF ¶ 50.) Plaintiff does not actually

¶ 50.) Plaintiff then went on disability leave again for one day on November 30, 1999 and afterwards was placed on temporary return to work status. (Def.'s SUMF ¶ 51; Potter Dep. Exh. 5 at FDX 01087.) Temporary return to work means the employee works no less than 15 hours but no more than 28 hours per week. (Pla.'s Resp. to Def.'s SUMF ¶ 56; Pla.'s Exh. 23 at 124.) According to FedEx's leave of absence history, Plaintiff was on temporary return to work status from November 30, 1999 through April 17, 2000. (Potter Dep. Exh. 5 at 01087.)

On February 9, 2000, Dr. Antoine Jean–Pierre began treating Plaintiff. He completed a "Mental Health Assessment: Initial Report" for Kemper National Services ("Kemper"), which administers the disability program at FedEx, stating that he had instructed Plaintiff not to return to work after his examination. He also submitted a clinical report detailing his examination of Plaintiff. (Jean–Pierre Dep. Exh. 5.) Dr. Jean–Pierre completed a "Mental Health Assessment: Progress Report" for Plaintiff after seeing her for therapy on March 31, 2000. (Jean–Pierre Dep. Exh. 2.) At that time, he noted that Plaintiff showed improved ability to control her mood and seemed to be in an upbeat mood with much energy. (Id.) He projected that he would be able to provide Plaintiff a clinical release to work on April 17, 2000. (Id.; Def.'s SUMF ¶ 61.)

On May 8, 2000, Dr. Jean–Pierre informed Kemper by letter that in his professional opinion Plaintiff could return to work without restrictions. He released her to work without any restrictions effective three weeks prior to the date of the letter (i.e. April 17, 2000).[7] (Def.'s SUMF ¶ 59; Jean–Pierre Dep. Exh. 1.) According to Dr. Jean–Pierre's letter, Plaintiff expressed unhappiness with this opinion. (Jean–Pierre Dep. Exh. 1.) Dr. Jean–Pierre wrote, "At this point it is difficult to expect any further progress from a patient with a strong manipulative tendency and wants a professional to cover for not assuming her responsibility. It is my opinion that she has reached maximum improvement to return to full duty and I will no longer provide psychiatric services." (Id.) Dr. Jean–Pierre addressed a "To whom it may concern" letter on May 15, 2000 releasing Plaintiff to work with no restrictions. (Def.'s SUMF ¶¶ 62, 67; Jean–Pierre Dep. Exh. 3.) He also told Plaintiff on May 15, 2000 that she could return to work. (Def.'s SUMF ¶ 67.)

Mr. Potter received a fax from Kemper on May 12, 2000 that included a letter from Dr. Jean–Pierre releasing Plaintiff to return to work without restrictions as of April 17, 2000. (Def.'s SUMF ¶ 66.) Mr. Potter sent Plaintiff a memorandum on May 16, 2000 acknowledging his receipt of notification from Plaintiff's physician that she was available to return to work with no restrictions. (Def.'s SUMF ¶ 68.) Mr. Potter requested a meeting with Plaintiff on May 22, 2000 to review her assignments and discuss matters relevant to her return to work. (Def.'s SUMF 70.) Plaintiff returned to work on May 22, but was absent again on May 23. (Def.'s SUMF ¶ 75.)

Dr. Robert Fink began treating Plaintiff on May 19, 2000. (Def.'s SUMF ¶ 69.) He addressed a "To whom it may concern" letter on May 19, 2000 stating that Plain-

offer a date upon which she contends she received Mr. Potter's letter.

7. Plaintiff states that she disputes this fact on the grounds that the reports are conflicting because Dr. Jean–Pierre advised Kemper on May 8, 2000 that she could return to work as of April 17, 2000, but that he did not provide an actual letter of release until May 15, 2000. (Pla.'s Resp. to Def.'s SUMF ¶ 59.) These statements are plainly not in conflict as Dr. Jean–Pierre released Plaintiff to work at that time and the documents speak for themselves.

tiff should remain off work for approximately two weeks. (*Id.*) Plaintiff sent this letter to Mr. Potter on May 23, 2000. (Def.'s SUMF ¶¶ 71, 73.) Mr. Potter received this letter on May 24, 2000 and again placed her on leave in FedEx's computer system. (Def.'s SUMF ¶ 75.)

Based on Dr. Jean–Pierre's earlier release to return to work, Kemper sent Plaintiff a letter on May 30, 2000 informing her that her claim for disability benefits was denied as of May 7, 2000. (Def.'s SUMF ¶ 76; Owens Dep. Exh. 3.) On September 22, 2000, the FedEx employee benefits department received a copy of the letter from Kemper advising that Plaintiff was no longer eligible for disability benefits. (*Id.*) Prior to receiving this letter, neither Mr. Potter, nor Laz Owens, the Human Resources Advisor, were aware that Kemper had denied benefits to Plaintiff. (Def.'s SUMF ¶ 79.) It is not clear from the record why Kemper did not notify FedEx for almost seven months regarding the denial of Plaintiff's disability benefits.

FedEx treats a denial of further benefits as a release to return to work. (Def.'s SUMF ¶ 55.) Therefore, Mr. Owens advised Mr. Potter to return Plaintiff to work based on FedEx's policy and Kemper's denial of benefits. (Owens Dep. at 40–41.) On September 28, 2000, Mr. Potter sent Plaintiff a standard return to work letter because Kemper had denied her disability leave. (Def.'s SUMF ¶ 83; Potter Dep. Exh. 10.) The letter requested that Plaintiff return to work on October 3, 2000 and stated that failure to return to work would be considered a voluntary resignation. (Potter Dep. Exh. 10.)

Under FedEx's policy, Plaintiff was still required to bring a medical release stating that she was cleared to work. (Pla.'s SUMF ¶ 7; Potter Dep. at 78; Pla.'s Exh. 22 at HRP 00038 [8].) Mr. Owens stated that he never saw any documentation from Plaintiff, or from a physician on her behalf, concerning her medical condition. (Owens Dep. at) According to Mr. Potter, he did not receive a release from Plaintiff other than Dr. Jean–Pierre's letter. Mr. Potter indicated that he insisted upon her return to work after four months of absence because Kemper had denied her disability leave and the last pieces of documentation FedEx had received from Plaintiff's physicians were Dr. Fink's May 19 letter stating Plaintiff would be off of work for two weeks and Dr. Jean–Pierre's May 15 letter stating that Plaintiff could return to work. (Pla.'s SUMF ¶ 7; Potter Dep. at 76–80.) Accordingly, the letter Mr. Potter sent requested that Plaintiff return to work on October 2, 2000 or provide medical substantiation for her continued absence. (Potter Dep. Exh. 10.)

On September 23, 2000, Dr. Fink evaluated Plaintiff and completed a form indicating that Plaintiff's "functional level at this point appeared, in my opinion, not to warrant continued covered medical leave. I indicated that I could no longer sustain this." (Def.'s SUMF ¶ 80.) September 23, 2000 was the last time Plaintiff saw Dr. Fink. Plaintiff never provided FedEx with a copy of Dr. Fink's September 23 findings. (Def.'s SUMF ¶¶ 81, 82.)

Plaintiff returned to work on October 2 or 3, 2000. (Def.'s SUMF ¶ 86.) On October 4, 2000, Mr. Potter spoke with Plaintiff, who told him she was going to get

---

8. The FedEx Corporate Services Human Resources Policies manual, dated June 12, 2000, states in pertinent part:
 *Return From Leave* .... Under no circumstances should an employee return to work without a release from a treating physician or IME, or the claim is denied by a disability review physician.

something from her doctor about her fitness to return to work. For this reason, Mr. Potter approved three days of reserved vacation time, from October 4–6. (Def.'s SUMF ¶¶ 87, 92, 93.) Mr. Potter expected her to return to work on October 9, 2000.

Plaintiff did report to work on October 9, but left "sick" at approximately 3:45 p.m. (Def.'s SUMF ¶ 94.) On October 10, Plaintiff did not report to work until 10:45 p.m. (Def.'s SUMF ¶ 95.) On October 11, Plaintiff called in to say that she would be late because she needed to pick up a prescription. (Def.'s SUMF ¶ 99.) In response to Plaintiff's failure to work full days, Mr. Potter spoke with Plaintiff about her absences from work. He also sent Plaintiff a memorandum reminding her that business hours at FedEx are from 8:00 a.m. until 5:00 p.m. and informing her that her failure to comply with the required hours was unacceptable. (Def.'s SUMF ¶ 104; Potter Dep. Exh. 33.)

Also on October 11, 2000, Plaintiff sent Mr. Potter and Mr. Owens an e-mail stating, "I have validated that I have an employee disability .... I am requesting special accommodations for working hours and conditions. This accommodation will allow me to continue taking my medication while working. Thank you for your attention to this request." (Def.'s SUMF ¶ 100.) Mr. Potter does not recall Plaintiff requesting any accommodation prior to the October 11 e-mail.[9] (Def.'s SUMF ¶ 101.) Plaintiff then left work early on October 11 after leaving a written message for Mr. Potter informing him that she needed to leave at 4:35 p.m. in order to take medication. (Def.'s SUMF ¶ 99; Potter Dep. Exh. 34.)

On October 12, 2000, Mr. Potter responded in writing to Plaintiff's note from the previous day requesting an accommodation and stating that she would be leaving early to take medication. (Def.'s SUMF ¶ 105.) Mr. Potter's response stated:

> Almella, again, you cannot do this on a daily basis unless you provide documentation from a physician and you request an accommodation. At that time, it will be determined if we can accommodate your request. Other individuals taking medicine are not allowed to do this without fulfilling this requirement.... You are missing a significant portion of the working day as outlined in the reminder letter I sent you yesterday (Wednesday, Oct. 11). Again, please observe the normal working hours as I have outlined to you. I will view any additional occurrences as a reason for disciplinary action. There are procedures to follow and I have outlined them for you on more than one occasion. You seem determined to ignore my direction. Please follow this procedure if you need an accommodation.

(Potter Dep. Exh. 34.)

On October 12, 2000, Plaintiff did not report to work until 10:45 a.m. Mr. Potter sent Plaintiff another memorandum reminding her that her absences from work, including late arrivals and early departures, were unacceptable. (Def.'s SUMF ¶ 106; Potter Exh. 36.)

Mr. Owens advised Mr. Potter regarding Plaintiff's request for an accommodation. (Def.'s SUMF ¶ 102.) After speaking with Mr. Owens, Mr. Potter also informed Plaintiff in writing in the October 12, 2000 memorandum that he

---

9. Plaintiff disputes this fact and relies on the documents attached as collective Exhibit 19 to her response. However, as noted above, the Court has stricken these documents be- cause Plaintiff failed to authenticate them and Defendant's employees deny ever receiving them.

needed her to provide two things so that FedEx could validate her need to miss work and determine whether FedEx could provide her with an accommodation. (Def.'s SUMF ¶ 106; Potter Exh. 36.) Mr. Potter's memorandum stated:

> To assist you upon your return to work (October 3, 2000), I agreed to let you use your reserve vacation to consult with your physician to determine your medical fitness to return to work and prepare any letters of accommodation that you might need. I have yet to receive any form of substantiation that you might have that would validate a need to miss work in the manner you have. I am again requesting that you:
>
> 1. Present evidence from your physician that supports any medical condition that you might have which would affect your ability to be at work.
>
> 2. Present to me in writing the need for any accommodation that you may need.

(*Id.*)

Plaintiff did not report to work on October 13. (Def.'s SUMF ¶ 107.) On Monday, October 16, 2000, Plaintiff did not report to work. According to an e-mail Mr. Potter received, Plaintiff called the receptionist and stated that she was getting her new ID badge, but she never came to work at all. (Def.'s SUMF ¶ 108.) Also on October 16, 2000, Mr. Potter received a letter from Plaintiff's attorney, Julian Bolton, who had been retained to advise Plaintiff regarding her employment status and her disability. The letter stated, in part, "[P]lease advise me of your policy on long-term disability. Further, a copy of such policy is also requested. Ms. Starks states that a doctor has cleared her for return to work without restrictions or accommodation. May I have a copy of that report." (Def.'s SUMF ¶ 109; Potter Dep. Exh. 38.)

On October 17, 2000, Plaintiff sent Mr. Potter a letter informing him that she would not be able to work the remainder of the week due to a medication adjustment. (Def.'s SUMF ¶ 111.) Mr. Potter never received substantiation from a doctor that she needed to miss work because of a medication adjustment. (Def.'s SUMF ¶ 112.) Plaintiff also did not come to work on Monday, October 23, 2000. (Def.'s SUMF ¶ 116.)

On October 31, 2000, Mr. Potter sent Plaintiff another memorandum regarding her absence from work. (Def.'s SUMF ¶ 117.) The memorandum stated:

> Almella, you have exhausted your medical leave of 10 days. We do not have medical substantiation for a continuance of medical related leave. It is imperative that you return to work by November 2, 2000 at 0800 hours . . . . Failure to return to work by this date will be considered a voluntary resignation. If you need to reach me prior to your returning to work, please call me at 901–434–9813.

(Potter Dep. Exh. 42.) Mr. Potter also left Plaintiff a voice-mail message with this information. (Def.'s SUMF ¶ 117.)

Plaintiff did not come to work between November 2 and November 8, nor did she contact Mr. Potter. (Def.'s SUMF ¶¶ 118–19, 121.) Between October 31 and November 8, Plaintiff did not provide Mr. Potter with any documentation from any doctors, nor did Plaintiff's attorney contact him. (Def.'s SUMF ¶ 121.) On November 8, 2000, FedEx sent Plaintiff a Voluntary Termination of Employment letter because she had not returned to work on November 2, 2000, nor had she contacted Mr. Potter though she had been requested to do so. (Def.'s SUMF ¶ 119.)

According to Mr. Potter, he never perceived that Plaintiff had a disability or knew the reason for her leaves of absence. (Def.'s SUMF ¶ 36, 48, 129.) He testified

that when she came to work she operated a personal digital assistant, operated a computer, understood FedEx software, drove a car, and dressed very nicely. (Def.'s SUMF ¶ 129.) He did not know she had been diagnosed as bipolar or that she had suffered from cancer. (Def.'s SUMF ¶ 89.) He also testified that he was unaware of Plaintiff's history of cancer and mental problems until he heard about them during his deposition. (Def.'s SUMF ¶ 48.) As Plaintiff's supervisor, Mr. Potter was required to record Plaintiff as disabled in FedEx's computer system (PRISM) as a matter of paperwork based on the duration of her absences from work, but he was never aware of the nature of any disability. (Def.'s SUMF ¶¶ 51–54, 36, 48.) Mr. Potter's assessment of Plaintiff's performance at FedEx upon her return from leave included the statement, "The only problems we had is when it was time to actually do something, and then we got sick." (Def.'s SUMF ¶ 130; Potter Dep. at 117–18.)

Plaintiff disputes whether Mr. Potter knew the reason for her leaves of absence and argues that his statements are self-serving. Plaintiff offers a statement from Mr. Potter's deposition that, as part of his managerial duties, he periodically inquired as to how she was doing while she was out on leave. (Potter Dep. at 29–30.) However, he never received a response from Plaintiff to his queries. (Id.) Plaintiff also cites to the denial of benefits letter Defendant received from Kemper on September 20, 2003. (Owens Dep. Exh. 3.) However, this letter does not indicate any of Plaintiff's medical history. Plaintiff also directs the Court to an e-mail Mr. Potter sent to Lisa Jacobs on April 21, 2000 stating, "There is nothing [Ms. Starks–Umoja] can do; unfortunately for whatever reason, she is incapable of any type of assignment. At

best she appears confused half of the time." (Pla.'s Exh. 14.) This e-mail generally discusses problems with Plaintiff's absenteeism and does not show an awareness of Plaintiff's medical history. (Id.)

Mr. Owens similarly testified that he was not aware of the nature of Plaintiff's illness, health problems, or her medical history at the time he was advising Mr. Potter about the status of Plaintiff's employment. (Def.'s SUMF ¶¶ 88–89.) He did not know that Plaintiff suffered from bipolar disorder or that she had had cancer. (Def.'s SUMF ¶ 89; Owens Dep. at 42–43.) According to Mr. Owens, Kemper does not disclose that information to FedEx. (Def.'s SUMF ¶ 91.)

Plaintiff disputes whether Mr. Owens knew the nature of her medical problems and cites to the denial of benefits letter received from Kemper on September 20, 2003. (Owens Dep. Exh. 3.) However, this letter does not indicate any of Plaintiff's medical history and Plaintiff offers no other evidence that Mr. Owens knew the nature of her medical history or her alleged disability.

Plaintiff filed a charge of discrimination with the EEOC on July 26, 2001 alleging that FedEx discriminated against her in violation of the Americans with Disabilities Act on November 2, 2000 [10] when it discharged her from the position of Senior Instructional Design Specialist. (Starks–Umoja Dep. Exh. 8.) Plaintiff did not check the retaliation box in her charge of discrimination. (Id.) The charge of discrimination states in pertinent part:

> I believe that I have been discriminated against because of my disability, in violation of the ADEA [sic], in that I was forced to return to work before being released from my Doctor. I could not

---

10. Plaintiff lists November 2, 2000 as the date of her termination on the charge of discrimination although FedEx sent the Voluntary Termination of Employment letter on November 8, 2000.

perform my duties because I could not work eight hours due to the medication I was taking. I was also denied an accommodation.

(*Id.*) After the EEOC issued a right to sue letter, Plaintiff filed a Complaint on October 21, 2001 alleging that FedEx discriminated against her in violation of the Americans with Disabilities Act based on her disability and retaliated against her. Plaintiff also asserted a cause of action based on the Tennessee Human Rights Act.

## IV. Summary Judgment Standard

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if . . . there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The Supreme Court has explained that the standard for determining whether summary judgment is appropriate is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

So long as the movant has met its initial burden of "demonstrat[ing] the absence of a genuine issue of material fact," *Celotex*, 477 U.S. at 323, 106 S.Ct. 2548, and the nonmoving party is unable to make such a showing, summary judgment is appropriate. *Emmons v. McLaughlin*, 874 F.2d 351, 353 (6th Cir.1989). In considering a motion for summary judgment, "the evidence as well as all inferences drawn therefrom must be read in a light most favorable to the party opposing the motion." *Kochins v. Linden–Alimak, Inc.*, 799 F.2d 1128, 1133 (6th Cir.1986); *see also Matsushita Elec. Indus. Co. v. Zenith*

*Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

## V. Analysis

FedEx has moved for summary judgment as to Plaintiff's claims of disability discrimination and retaliation in violation of the Americans with Disabilities Act and Plaintiff's claim that FedEx violated the Tennessee Human Rights Act.

### A. Disability Discrimination

The Americans with Disabilities Act provides:

> No covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.

42 U.S.C. § 12112(a) (2003).

■■■ To establish a *prima facie* case of employment discrimination based on disability, Plaintiff must establish that (1) she is a disabled person within the meaning of the ADA, (2) she is otherwise qualified, with or without reasonable accommodation, to perform the essential functions of the job, and (3) the employer terminated her because of her disability. *Gantt v. Wilson Sporting Goods Co.*, 143 F.3d 1042, 1047 (6th Cir.1998). If Plaintiff establishes a *prima facie* case, the burden shifts to Defendant to articulate a legitimate, non-discriminatory reason for its action. *Monette v. Electronic Data Sys. Corp.*, 90 F.3d 1173, 1179 (6th Cir.1996). If Defendant meets that burden, Plaintiff must show that the proferred explanation is a pretext for unlawful discrimination. *Id.*

## 1. Disability

The Americans with Disabilities Act defines disability as: 1) a physical or mental impairment that substantially limits one or more of the major life activities of an individual; 2) a record of such impairment; or 3) being regarded as having such an impairment. 42 U.S.C. § 12102(2). Plaintiff argues that she is disabled under all three definitions of disability.

### a. Substantially Limited in a Major Life Activity

■ Under the first definition of disability, Plaintiff must initially prove that she has a physical or mental impairment. 42 U.S.C. § 12102(2)(A). Plaintiff must then demonstrate that the impairment substantially limits at least one of her major life activities. *Id.* "It is insufficient for individuals attempting to prove disability status under this test to merely submit evidence of a medical diagnosis of an impairment." *Toyota Motor Mfg., Ky., Inc. v. Williams*, 534 U.S. 184, 198, 122 S.Ct. 681, 151 L.Ed.2d 615 (2002).

Neither party in this case has directly addressed the issue of whether Plaintiff has an impairment within the meaning of the ADA. Given Plaintiff's diagnosis of bipolar disorder, the Court assumes she has an impairment for purposes of the first definition of disability.

The parties have argued extensively in their papers about whether Plaintiff has an impairment that substantially limits a major life activity. Plaintiff argues that she is substantially limited in the major life activities of sleeping, cognitive functioning, concentration, and impaired affective modulation. (Pla.'s Mem. in Opp. to Def.'s Mot. for Summ. J. at 8.)

■ Major life activities constitute tasks central to most people's daily lives. *MX Group, Inc. v. City of Covington*, 293 F.3d 326, 337 (6th Cir.2002). According to the regulations implementing Title II, major life activities include such functions as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working. 28 C.F.R. § 35.104. This list is merely illustrative and not exhaustive. *MX Group*, 293 F.3d at 337.

The Sixth Circuit has accepted sleeping as a major life activity within the meaning of the ADA. *Boerst v. Gen. Mills Operations*, 25 Fed. Appx. 403, 406, 2002 U.S.App. Lexis 813, *9 (6th Cir. January 15, 2002).[11] However, following the Tenth Circuit, the Sixth Circuit has held that concentrating is not a major life activity. *Pack v. Kmart Corp.*, 166 F.3d 1300, 1305 (10th Cir.1999); *Linser v. Ohio Dep't of Public Health*, 2000 U.S.App. Lexis 25644, *9 (6th Cir. October 6, 2000); *Boerst*, 25 Fed. Appx. at 406.[12] With respect to cognitive functioning, the Court assumes this is an attempt to argue that Plaintiff is substantially limited in her ability to think. The Sixth Circuit has stated that it is doubtful that thinking constitutes a major life activity. *Hill v. Metro. Gov't of Nashville & Davidson County*, 54 Fed. Appx. 199, 201, 2002 U.S.App. Lexis 26276, *5 (6th Cir. Dec.17, 2002) (finding that the

**11.** The Court recognizes that this opinion is unpublished. However, Sixth Circuit Rule 28(g) allows for citation to unpublished opinions if "an unpublished disposition has precedential value in relation to a material issue in a case, and [ ] there is no published opinion that would serve as well." The Court, therefore, relies on the *Boerst* opinion because the Court has not located a published opinion in this circuit discussing whether sleeping is a major life activity.

**12.** The Court recognizes that these opinions are unpublished. The Court relies on the *Linser* and *Boerst* opinions because the Court has not located a published opinion in this circuit discussing whether concentrating is a major life activity.

plaintiff was not disabled although he suffered from bipolar disorder).[13] Plaintiff has not explained what "impaired affective modulation" means or how it constitutes a major life activity that has been substantially limited. Therefore, the Court will only consider whether Plaintiff is substantially limited in the major life activity of sleeping.

■ In support of her claim that she is substantially limited in the major life activity of sleeping, Plaintiff cites to her medical records, included the unauthenticated documents discussed *supra.* Plaintiff relies on the records of Dr. Fink and Dr. Jean–Pierre in support of her claim that she is substantially limited in the major life activity of sleeping, Dr. Jean–Pierre released her to return to work by letter dated May 15, 2000. Dr. Jean–Pierre also noted that he believed Plaintiff was manipulative and "wants a professional to cover for not assuming her responsibility." Similarly, Dr. Fink found that Plaintiff's functional level did not warrant continued covered medical leave in his September 23, 2000 evaluation (although Plaintiff did not provide this document to either Kemper or FedEx).[14] Furthermore, the records from Dr. Fink in which he notes that Plaintiff had trouble sleeping and showed impaired insight and judgment all pre-date his September 23, 2000 evaluation in which he indicated that he could no longer support continued medical leave.

In addition, Plaintiff's assertion that she is substantially limited in the major life activity of sleeping is entirely too conclusory to defeat Defendant's motion for summary judgment. None of the records or testimony Plaintiff has submitted indicate the nature or severity of her sleeping problems. For example, Dr. Neal noted on October 31, 2000 that "she hasn't been able to sleep". Plaintiff has not even provided evidence of how many hours of sleep she gets each night. *See Boerst,* 25 Fed. Appx. at 407 ("Getting between two and four hours of sleep a night, while inconvenient, simply lacks the kind of severity we require of an ailment before we will say that the ailment qualifies as a substantial limitation under the ADA.") This evidence is simply insufficient to show that Plaintiff is "substantially limited" in the major life activity of sleeping.

Furthermore, Dr. Joel Reisman performed an independent medical examination of Plaintiff in connection with this litigation. Dr. Reisman concluded, "There is little question that this claimant meets the diagnostic criteria for Bipolar Disorder." However, he noted that she functioned well in all areas and "that her sleep is normal and that she is happy." After interviewing Plaintiff and reviewing her medical records, Dr. Reisman stated, "It is therefore my opinion that at the time of her termination, she was also able to engage in activities central to most people's lives and she was capable of working in a broad range of employment situations." Dr. Reisman's findings are consistent with the findings of Dr. Jean–Pierre and Dr. Fink, both of whom believed Plaintiff could return to work.

Finally, Defendant has submitted a significant amount of uncontradicted evidence that Plaintiff is an adult who functions quite capably. Among other things, she

---

13. The Court recognizes that this opinion is unpublished. The Court relies on *Hill* decision because the Court has not located a published opinion in this circuit discussing whether thinking is a major life activity and because of the factual similarity to the case before the Court.

14. Even if the Court were to consider the unauthenticated medical records Plaintiff has submitted, they would not alter the Court's decision.

cooks for her family, drives her daughter to school, plays the piano, helps her daughter with homework, does the laundry, conducts music workshops at churches and retreats, visits church members, and is employed as the pastor at her church where she gives weekly sermons and conducts Baptisms, Anointing Services, and Communions. (Def.'s SUMF ¶¶ 10, 12–16, 20, 137–154.) Plaintiff also holds two Master's Degrees. (Def.'s SUMF ¶¶ 6, 7.)

The Court finds that there is insufficient evidence to support a finding that Plaintiff is substantially limited in the major life activity of sleeping within the meaning of the ADA. Merely having an impairment does not make Plaintiff disabled for purposes of the ADA. Therefore, while Plaintiff's bipolar disorder may be an impairment, Plaintiff does not meet the first test for disability.

**b. Record of an Impairment**

Under the second definition of disability, Plaintiff is required to show that she has a record of an impairment. "The phrase has a record of such an impairment means has a history of, or has been misclassified as having, a mental or physical impairment *that substantially limits one or more major life activities.*" 28 C.F.R. § 35.104; *MX Group,* 293 F.3d at 337 (emphasis added).

 Plaintiff certainly has a record of having suffered from bipolar disorder and having undergone a mastectomy. She has been under the care of various psychiatrists for a lengthy period of time. Additionally, she was on disability leave from her job at FedEx for approximately five years. However, Plaintiff has done nothing more than provide the Court with evidence of her impairment in support of her argument under this test of disability. She has not provided the Court with a record of an impairment that has caused her to be substantially limited in any activity that is central to most people's lives. The existence of an impairment is not sufficient to show that Plaintiff has a record of being substantially limited in a major life activity within the second definition of disability.[15]

**c. Regarded as Disabled**

 Under the third definition of disability, Plaintiff must show that Defendant *mistakenly* believes that: 1) Ms. Starks–Umoja has a physical impairment that substantially limits one or more major life activities; or 2) Ms. Starks–Umoja has an actual, non-limiting impairment that substantially limits one or more major life activities. *Sutton,* 527 U.S. at 489, 119 S.Ct. 2139. "It is not enough ... that the employer regarded [the] individual as somehow disabled; rather, the plaintiff must show that the employer regarded the individual as disabled within the meaning of the ADA." *Ross v. Campbell Soup Co.,* 237 F.3d 701, 709 (6th Cir.2001).

In support of her claim under this definition of disability, Plaintiff asserts that FedEx regarded her as substantially limited in the major life activities of stress, concentrating, and working. (Pla.'s Mem. in Opp. to Def.'s Mot. for Summ. J. at 11.) Stress is clearly not a major life activity. As discussed above, concentrating is not a major life activity. Therefore, the Court will only discuss whether FedEx regarded Plaintiff as substantially limited in the major life activity of working.

15. The Court also notes that there is no evidence that either Mr. Potter or Mr. Owens were aware of this record of Plaintiff's impairment because Kemper did not disclose Plaintiff's medical records to FedEx. At most, they were aware that she had been on disability leave and that she was taking medication when she was called back to work in September of 2000.

In order for Plaintiff to establish that FedEx regarded Plaintiff as substantially limited in the major life activity of working, Plaintiff is required to show that FedEx believed she was "significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes." 29 C.F.R. § 1630.2(j)(3)(i).

In support of her claim that FedEx regarded her as substantially limited in the major life activity of working, Plaintiff points to an e-mail sent from Mr. Potter to Lisa Jacobs, a Human Capital Management Program Specialist, some six months before her actual termination. In the e-mail from Mr. Potter, dated April 21, 2000, he writes:

> Almella Starks–Umoja has been back on [Temporary Return to Work] since Monday. She has called in sick two of the four days she has been on assignment.... I am going to have to hire a temporary to cover her assignment due to her absenteeism. I am at the end of my rope with her. There is nothing she can do; unfortunately for whatever reason, she is incapable of any type of assignment. At best she appears confused half of the time.

> What are our options here. For any type of work we do, she is unable to perform. I would like to process termination. Is there any reason from your standpoint that this cannot be done? Please advise.

Notwithstanding the above e-mail, there is no evidence that either Mr. Potter, Plaintiff's supervisor, or Mr. Owens, the Human Resources Advisor, were aware of Plaintiff's bipolar disorder or her previous treatment for breast cancer. At most, the evidence indicates that they knew that Plaintiff took medication and that she had previously been on disability leave. The Court does not believe Mr. Potter or Mr. Owens made the decision to terminate Plaintiff's employment based on a mistaken belief about Plaintiff's mental impairment. In fact, rather than terminating Plaintiff based on a perceived disability, both Mr. Potter and Mr. Owens wanted to return Plaintiff to work because they believed she did not suffer from a disability at all. They decided to terminate Plaintiff's employment after she failed to adhere to FedEx's attendance requirements by failing to show up for work and failing to provide medical documentation for continued medical leave.

The Court has strong doubts about whether Plaintiff could ultimately establish that FedEx regarded her as disabled based on Mr. Potter's e-mail, particularly in light of the fact that the e-mail appears to be an ambiguous isolated comment made months before Plaintiff's termination. However, given the factual similarity between the e-mail at issue in this case and the memo at issue in the Sixth Circuit's decision in *Ross v. Campbell Soup Co.*, 237 F.3d 701, 704 (6th Cir.2001), the Court can not say on a motion for summary judgment that FedEx did not regard Plaintiff as disabled. In *Ross*, the Sixth Circuit found that the plaintiff, suffering from a back injury, had created a genuine issue of material fact under the "regarded as" definition of disability where he offered evidence of an internal company memorandum stating "Maureen—When can we bring this problem person to a termination status. P.S.—Back Case." *Id.* at 706. Therefore, for purposes of summary judgment, the Court assumes that FedEx regarded Plaintiff as disabled and assumes Plaintiff satisfies the third test for disability.

## 2. Otherwise Qualified

 Even if Plaintiff can establish that FedEx regarded her as disabled, she has not presented evidence that she is

otherwise qualified to perform the duties of the position in question with or without reasonable accommodation. To be considered qualified, "an employee must demonstrate that he or she was meeting the employer's legitimate expectations and was performing to the employer's satisfaction." *Dews v. A.B. Dick Co.*, 231 F.3d 1016, 1022 (6th Cir.2000). "An employee who cannot meet the attendance requirements of the job at issue cannot be considered a 'qualified' individual protected by the ADA." *Gantt v. Wilson Sporting Goods Co.*, 143 F.3d 1042, 1047 (6th Cir.1998). Plaintiff plainly failed to meet the attendance requirements for a position at FedEx. She continuously arrived late to work, left early, or did not show up at all. She also failed to provide medical documentation for her absences in response to repeated requests from her supervisor.

 Significantly, although Plaintiff mentioned an accommodation with respect to her hours and working conditions in an e-mail to Mr. Potter, she failed to specify the nature of the accommodation and she failed to provide medical documentation for her accommodation request. "Generally, it is the responsibility of the individual with a disability to inform the employer that an accommodation is needed.... Once a qualified individual with a disability has requested provision of a reasonable accommodation, the employer must make a reasonable effort to determine the appropriate accommodation." *Gantt*, 143 F.3d at 1046 (quoting 29 C.F.R. pt. 1630 App.

§ 1630.9) (internal quotation marks omitted). "There is no question that the EEOC has placed the initial burden of requesting an accommodation on the employee. The employer is not required to speculate as to the extent of the employee's disability or the employee's need or desire for an accommodation." *Gantt*, 143 F.3d at 1046.

In response to Plaintiff's e-mail mentioning an accommodation, Mr. Potter appropriately requested that she clarify her needs with respect to an accommodation and provide medical documentation for her request. "When the need for an accommodation is not obvious, an employer, before providing a reasonable accommodation, may require that the individual with a disability provide documentation of the need for accommodation." 29 C.F.R. pt. 1630 App. § 1630.9. Plaintiff never responded to Mr. Potter to clarify her request for an accommodation.[16] Plaintiff also neglected to provide medical documentation for any accommodation. She simply failed to appear at work. Plaintiff did not satisfy her responsibility with respect to requesting an accommodation and has not created a genuine issue of material fact as to whether she was otherwise qualified to perform her job with or without reasonable accommodation. Therefore, Plaintiff has failed to establish a *prima facie* case of discrimination. The Court GRANTS Defendant's motion for summary judgment on Plaintiff's claim of disability discrimination.

---

**16.** The Court has previously stricken, *supra*, two memoranda addressed from Plaintiff to Mr. Potter, Mr. Owens, and Lisa Jacobs regarding her accommodation request because they were not authenticated and were not produced during discovery. Mr. Potter, Mr. Owens, and Ms. Jacobs also submitted affidavits stating they never received either of these memoranda.

Even if the Court considers these memoranda in response to the motion for summary judgment, they do not alter the Court's decision. Although one of the memoranda purports to specify Plaintiff's accommodation request regarding her working hours and conditions, neither memorandum is accompanied by documentation from a physician confirming a medical necessity for such an accommodation as clearly requested several times by Mr. Potter.

### 3. Legitimate Non–Discriminatory Reason/Pretext

█ In addition to contesting Plaintiff's *prima facie* case of disability discrimination, FedEx has offered a legitimate non-discriminatory reason for Plaintiff's discharge. FedEx asserts that it terminated Plaintiff's employment due to her repeated absences from work without medical documentation. This constitutes valid grounds for discharge. In her response, Plaintiff has not offered any evidence of pretext and has not even argued that FedEx's stated reasons for discharge were pretextual. Therefore, even if the Court determined that Plaintiff satisfied the elements of the *prima facie* case, the Court would grant FedEx's motion for summary judgment.

In this case, rather than showing discrimination based on disability, the evidence in this case tends to suggest that Plaintiff no longer wished to perform in her job at FedEx and sought out doctors who, at least initially, would support her claim for disability leave. It appears that as soon as a doctor cleared her to return to full time work, she then changed doctors. On September 23, 2000, Dr. Fink found that her functional level did not support continued medical leave, a fact that she did not disclose to FedEx, and when she could not find another doctor to support continued medical leave despite being given leeway from FedEx to do so, she simply did not show up for work, which ultimately led to her termination.

### B. Retaliation

█ Plaintiff also asserts a retaliation claim against FedEx. However, Plaintiff did not check the retaliation box on her charge of discrimination. Therefore, she has failed to exhaust her administrative remedies.[17] *Ang v. Procter & Gamble Co.*, 932 F.2d 540, 545 (6th Cir.1991). Additionally, she filed the charge of discrimination *after* FedEx had already terminated her employment. Any allegedly retaliatory conduct would have occurred prior to the filing of her EEOC charge and, therefore, should have been included in the original charge.[18] *Id.* at 547. The Court GRANTS Defendant's motion for summary judgment on Plaintiff's retaliation claim.

### C. Tennessee Human Rights Act

Tennessee Courts look to the Americans with Disabilities Act when interpreting claims under the Tennessee Human Rights Act, Tenn.Code Ann. § 4–21–101, *et seq.* *Dunn v. Sharp Mfg. Co.*, 2003 WL 1793038, 2003 U.S. Dist. Lexis 6454, *8 (W.D.Tenn. Jan. 10, 2003) citing *Barnes v. Goodyear Tire & Rubber Co.*, 48 S.W.3d 698, 706 (Tenn.2000). Because the Court has granted summary judgment in favor of FedEx on Plaintiff's ADA claims, the Court also GRANTS Defendant's motion for summary judgment on Plaintiff's Tennessee Human Rights Act claims.

17. Plaintiff alleges in part that FedEx retaliated against her in response to a charge of discrimination she filed in 1994. There is no evidence of a causal connection between her termination in November of 2000 and the discrimination charge filed in 1994, particularly since Plaintiff has not provided evidence that anyone involved in the decision to terminate her employment was aware of this prior charge.

18. Plaintiff's attempt to distinguish her case from *Ang* on the basis that an attorney did not help her prepare the charge is unavailing. She had retained an attorney before filing the charge of discrimination. She had previously filed a charge of discrimination with the EEOC in 1994. Additionally, in her response to the motion for summary judgment Plaintiff stated, "Ms. Starks–Umoja was knowledgeable of the EEOC procedures." (Pla.'s Mem. in Opp. to Def.'s Mot. for Summ. J. at 17.)

## VI. Conclusion

For the foregoing reasons, the Court GRANTS Defendant's motion for summary judgment.